Howard O. TEDFORD, Plaintiff-Appellee,

v.

PEABODY COAL COMPANY, International Union, United Mine Workers of America, et al., Defendants-Appellants.

No. 74–3736.

United States Court of Appeals, Fifth Circuit.

June 21, 1976.

Jack Drake, University, Ala., for Union.

Charles H. Huey, John W. Cooper, Birmingham, Ala., for plaintiff-appellee.

Charles A. Powell, III, Birmingham, Ala., Peter J. Palumbo, Jr., St. Louis, Mo., for Peabody Coal Co.

Before THORNBERRY and AINSWORTH, Circuit Judges, and HOFFMAN *, District Judge.

WALTER E. HOFFMAN, District Judge.

The ultimate issue in this case pertains to the duty of fair representation which a union owes to its employee. In a trial without a jury the district court, by extensive findings of fact and conclusions of law, determined that appellee, Tedford, was entitled to his former position of shovel operator working for Peabody Coal Company (Peabody), together with his damages occasioned by the decrease in wages as a result of his being denied his former job, plus reasonable attorneys' fees. From a judgment entered for Tedford, Peabody and International Union, United Mine Workers of America (UMWA), appeal. We fully realize that we are bound by the district court's findings of fact unless clearly erroneous but, in this case, we are convinced that the trial court misapplied the applicable law to the factual situation presented. Accordingly, we reverse with directions to enter final judgment in favor of both appellants.

Prior to October 1, 1970, Tedford was a shovel operator employed by Peabody at the Warrior Mine in Warrior, Alabama. He was also a member of Local 1500 of UMWA. As a result of collective bargaining between UMWA and Peabody,[1] a leave of absence clause stated:

Employees will be granted leave of absence in order to serve as a district or international officer or representative and shall retain their seniority earned

---

* District Judge of the Eastern District of Virginia, sitting by designation.

1. While there were two agreements applicable to the times pertinent to this case, the wording of the agreements are identical as applied herein.

prior to their layoff and will continue to accrue seniority while serving in the capacity of union officer or representative. This provision is retroactive to April 1, 1964.[2]

The agreements do not specify whether a union representative or officer, taken from the field of employees, will be entitled to his identical position and salary when he relinquishes his position as union representative or officer and returns to his employment with the employer. Tedford insists that he was entitled to his former position as shovel operator, after serving as a full-time union representative for District 20 from October 1, 1970, until February 12, 1973, a period of two years, four months and twelve days. The UMWA and Peabody claim that a fair construction of this clause does not assure such employee the return of his precise former job, although it is conceded that seniority continues to accrue.

When Tedford went with UMWA on October 1, 1970 as a representative, his former job was posted as open and bid upon as a permanent position. One Starnes was the successful bidder and he worked Tedford's former job as a shovel operator which, incidentally, was a position requiring only the services of one man.

Tedford had obtained successive leaves of absence from October 1, 1970 with the final leave period expiring on February 12, 1973. At no time did Peabody reject his request for leave. Of course, Tedford was carried on the union payroll during his leaves of absence.

When Tedford returned to work at the Warrior Mine on February 12, 1973, Peabody was confronted with the problem of the shovel operator. If Tedford had been entitled to his old position of shovel operator, Starnes would have been demoted to a lesser job. In turn, others would have been bumped down the ladder. There were, in fact, twelve employees so affected if Tedford replaced Starnes.

From February 12 until February 19, Peabody used both Tedford and Starnes in the same position as shovel operator, each receiving the same rate of pay. In the meantime the union had been contacted as to a resolution of the problem.

On February 19, 1973, Peabody, acting on the directions of UMWA, assigned Tedford to the less skilled and lower paid job of pumper, a daily differential in pay of approximately $7.00.

On February 21, 1973, Tedford filed two grievances. At steps one and two of the grievance procedure, Tedford was successfully represented by Local 1500. At step three, the UMWA represented Tedford and it was there resolved that Tedford was not entitled to return to his old job as shovel operator, thus putting Tedford in the pumper category. This action followed as the grievances were not taken to the next step.

The background of Tedford's contended position lies in a prior *oral* interpretation of the leave-of-absence provision by W. A. "Tony" Boyle, who served as international president of UMWA from October 1, 1970 until December 21, 1972, at which time he was succeeded by Arnold Miller as the result of an election in which Miller defeated Boyle. According to C. E. Beane, the president of District 20, former President Boyle had repeatedly ruled that a man on leave-of-absence status was entitled to his old job upon expiration of the temporary [3] leave of absence.

**2.** Section 5 of the National Bituminous Coal Wage Agreement of 1968, and Article XIII, Section (e) of the National Bituminous Coal Wage Agreement of 1971.

**3.** We need not consider whether an absence of more than two years may be considered "temporary". The collective bargaining agreement does not define the term "temporary" and we assume, for the purpose of this opinion, that the leaves of absence granted to Tedford were "temporary" to the extent of protecting his seniority rights, but not with respect to his former job. Peabody is criticized for permitting Tedford's job as shovel operator to be bid as a permanent job. However, the collective bargaining agreement refers to the word "layoff" which implies a degree of permanency in the separation.

The constitution of the international union places the power of doubtful language in labor-management contracts *solely* in the international president insofar as the union is concerned.

During the entire period of Boyle's regime as president of UMWA there was no written interpretation of the leave-of-absence provision and no record of any grievance being filed by any union member under this clause. The UMWA contract department had never been advised of the Boyle interpretation. On some date during the week prior to January 15, 1973, the question did arise on an inquiry from Ohio which was unrelated to the Tedford incident. The union's contract department, acting through John McGuire, sent a letter to the international executive board member dated January 15, 1973, reading in part as follows:

Under Article XIII, section (e), "Leaves of Absence", a provision is made that anyone accepting a union position is entitled to accrued seniority prior to the leave and shall be entitled to a job at the mine. However, that does not mean necessarily his former job. That, again, depends upon whether his job was considered temporary or regular.

The grey area between should be taken up through the settlement of disputes provision of the agreement, though persons appointed to staff positions could hardly be classified as temporary employees unless there was original intent to retain the employee on only a short-term basis.

Several weeks thereafter, on February 8, 1973, one Patrick, secretary-treasurer of UMWA, directed a memorandum to all UMWA district presidents and secretary-treasurers. The so-called Patrick letter, referring to the seniority clause, stated in part:

Our interpretation of this is that a worker will be entitled to return to the place he would have held on the seniority roster had he not taken a leave of absence. That is to say, he returns with full seniority. He is to be given a job to which his seniority and qualifications entitle him. This may or may not be his own job, depending upon circumstances. He may bid on a posted job to which his seniority and his qualifications entitle him. If his seniority does not entitle him to any job at the moment, he will be put on the panel and will thereafter be entitled to employment on the basis of his seniority.

Miners who leave their jobs to accept employment with the union do not thereby acquire super seniority. In effect, while they are working for the union, they are on a kind of escalator which moves up and down, depending on the conditions in the mine, and when their service at the union is at an end, they come back to where they would have been on the basis of their seniority and qualifications, had they never accepted a leave of absence. They do not acquire an absolute right to return to their old job.

After Tedford and Starnes had been working at the same job as shovel operator for one week, Miller, the president of UMWA, telephoned Beane, the president of District 20, and advised Beane that Beane's prior decision was erroneous. Miller told Beane to notify Peabody and Local 1500 that Tedford had been placed in the wrong job and that Tedford was not entitled to return to his old job as shovel operator. Since no grievance had been filed over Tedford being awarded his old job, Beane advised the local and Peabody of the position taken by President Miller. Accordingly, Peabody removed Tedford from the shovel operator job and classified him as a pumper.

The district court found that, on four comparable occasions at the Warrior Mine, men had left to work for the union and when they returned they received their old jobs. It is true that four employees had been granted leaves of absence but hardly under comparable occasions. The record discloses that George Feltman was granted a two-month leave of absence to serve as an observer in District 20 headquarters during union elections; Bruce Patton was granted

a three-week leave of absence to serve on a committee at the International Convention of UMWA; Willie Hill was granted a four-month's leave to work at another Peabody mine; and Truman Woods received a four-month's leave to work at another Peabody mine. None of these four individuals requested leave under the leave-of-absence provision specified under Article XIII, section (e). Feltman had been appointed to his observer position by order of the United States District Court for the District of Columbia because of the election where Miller was running against Boyle. Among the four involved, only Patton was actually working for the union for a limited period of three weeks. While we deem the use of the words "comparable occasions" as clearly erroneous in establishing a prior practice and custom that union employees were entitled to their exact same jobs upon termination of their leaves of absence we find it unnecessary to single out this point in arriving at our conclusion.

■ When the original complaint was filed, Tedford's only factual reference to discrimination was that four other employees had been granted leaves of absence and were thereafter returned to their jobs. Under Paragraph XX, Tedford makes a conclusory allegation that Peabody's action was arbitrary and capricious in removing him from his shovel operator's job and assigning him to the pumper's job. However, five months thereafter, Tedford amended his complaint by alleging that he was an active supporter of Boyle and that the issuance of the Patrick letter of February 8, 1973, establishing guidelines constituted a discriminatory act directed against Boyle supporters. Had these facts been established, we would have a different case as acts of reprisal may well be considered as arbitrary, capricious, discriminatory and in bad faith.

The district court correctly found that the evidence was insufficient to support the allegations that plaintiff was singled out for retroactive treatment because of Tedford's support of Boyle's reelection bid. In fact, the district court relied solely upon a finding of arbitrariness predicated upon Tedford's justified reliance upon prior interpretation or custom and a subsequent reversal of such interpretation or custom. There was no suggestion of hostility, discrimination, bad faith or capriciousness.

■ There is credible evidence that two Peabody officials, Phallen and Beasley, interpreted the leave-of-absence clause in the same manner as Tedford prior to the time Tedford requested his first leave of absence. However, Tedford then had no knowledge of the oral Boyle interpretation as related by Beane. We agree with the finding that Tedford relied upon statements made by two Peabody officials before obtaining his first leave of absence. Of course, a unilateral interpretation by Peabody officials is not *per se* binding on the parties.

The district court found that the Boyle interpretation was reasonable and the gist of its decision lies in the following two paragraphs as related by the trial judge:

Section (e) also provided that the employee on leave of absence to work for the union would not only retain his seniority but would continue to accrue seniority while serving in the capacity of union officer or representative. Such words imply that the essence of the section was that the employee was to be treated as if he were still on the job. It would not seem reasonable that a man would leave his job for a stay with the union that was classified as temporary without assurance that he would be restored to his old position. Plaintiff was the most senior employee at the mine when he took his first temporary leave and at all times since. In light of these findings of justified reliance, a reversal of interpretation or custom which is to have retroactive effect amounts in itself to arbitrary conduct.

■ If the foregoing ruling is sustained, the duty of fair representation will be extended so as to protect the interest of the individual employee without regard to the group interests.

The major goal of the duty of fair representation is to identify and protect individual

expectations as far as possible without undermining collective interests.[4] Where the individual and collective group interests clash, the former must yield to the latter.[5] When collective bargaining agreements are executed, there may be many provisions which lead individual employees to believe they are entitled to specified benefits but, in the final analysis, the collective group interests must remain paramount. The nature of any labor policy requires an election between preserving the group interests through democratic processes and adopting external restraints to protect the minority.

The essence of this action lies not in the Boyle interpretation deemed reasonable by the district court, but in the reasonableness of the Patrick-Miller interpretation as stated in the so-called Patrick letter dated February 8, 1973.

█ To uphold the union's action in interpreting the contract as it did it is not necessary that we find on the merits that such an interpretation was correct. *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). Rather, we must find that the union's action was not "arbitrary, discriminatory, or in bad faith". 386 U.S. at 190, 87 S.Ct. at 916, 17 L.Ed.2d at 857. Since it is conceded on appeal that the union's action was neither discriminatory nor in bad faith, all that we need consider is whether it was arbitrary.[6] The arbitrariness standard is difficult to define.[7] However, we think a decision to be nonarbitrary must be (1) based upon relevant, permissible union factors [8] which excludes the possibility of it being based upon motivations such as personal animosity or political favoritism; (2) a rational result of the consideration of those factors; and (3) inclusive of a fair and impartial consideration of the interests of all employees.[9]

█ There were really two decisions involved here. One was the decision by the international executive officers of the union, embodied in the Patrick memorandum dated February 8, 1973, to interpret the contractual provision as affording returning union members panel rights (rights to bid on available jobs in accordance with ac-

---

4. After Tedford and Starnes were assigned to the same job on February 12, 1973, the employees of Peabody at the Warrior Mine threatened a strike, primarily because of the "roll-back" of the twelve affected employees.

5. In *Vaca v. Sipes,* 386 U.S. 171, 182, 87 S.Ct. 903, 912, 17 L.Ed.2d 842, 853 (1967), Mr. Justice White, speaking for the majority said: "The collective bargaining system as encouraged by Congress and administered by the NLRB of necessity subordinates the interests of an individual employee to the collective interests of all employees in a bargaining unit. See, e. g., *J. I. Case Co. v. Labor Board,* 321 U.S. 332, [64 S.Ct. 576, 88 L.Ed. 762]."

6. As was stated in *Sanderson v. Ford Motor Co.,* 483 F.2d 102, 110 (5 Cir. 1973), the Supreme Court's definition of the duty of fair representation recognizes three distinct standards of conduct. The use of the disjunctive "or" in the language quoted above supports this conclusion as well as the lengthier definition enunciated in *Vaca.* Under the doctrine of fair representation "the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." 386 U.S. at 177, 87 S.Ct. at 910, 17 L.Ed.2d at 850.

See also *Griffin v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW,* 469 F.2d 181 (4 Cir. 1972).

7. See Clark, "The Duty of Fair Representation: A Theoretical Structure", 51 Tex.L.Rev. 1119–1178 (1973).

8. In *Humphrey v. Moore,* 375 U.S. 335, 350, 84 S.Ct. 363, 372, 11 L.Ed.2d 370, 382, the court stated in upholding the union's decision to dovetail the seniority lists of employees at two different companies "[B]y choosing to integrate seniority lists based upon length of service at either company, the union acted upon wholly relevant considerations, not upon capricious or arbitrary factors. The evidence shows no breach by the union of its duty of fair representation."

9. "By its [the union's] selection as bargaining representative, it has become the agent of all the employees, charged with the responsibility of representing their interests fairly and impartially." *Wallace Corp. v. Labor Board,* 323 U.S. 248, 255, 65 S.Ct. 238, 241, 89 L.Ed. 216, 227 (1944). Quoted with approval in *Humphrey v. Moore,* 375 U.S. 335, 342, 84 S.Ct. 363, 367, 11 L.Ed.2d 370, 377 (1964).

crued seniority) but not necessarily their exact same job. The second decision was to apply this interpretation specifically to the Tedford situation and was communicated to Beane by Miller's telephone call on February 19, 1973.

The union's decision by the executive officers came in response to numerous calls from District 6 union members complaining about the action of Miller supporters in attempting to arrange to get their old jobs back when they returned to the mines after working in the union.[10] Strikes were threatened by the disaffected workers. In this situation the union had to balance the interests of union members electing union work versus the interests of the workers remaining at the mine in obtaining jobs which would otherwise be considered reserved for unspecified periods of time. Once that decision was made in favor of the workers at the mines, consistency required that it be applied to Tedford. The same considerations applied to Tedford as they did to other cases. In this particular case there was a conflict between the interests of Tedford and the interests of the twelve other miners subject to the rollback if Tedford reclaimed his old job.

We think the union's interpretation of the contract provision to guarantee panel rights but not former jobs to returning union workers was based upon relevant, permissible factors.[11] The union desired to avoid disruptions caused by strikes at the various mines. Further it considered that fairness required allowing mine workers to bid on jobs left vacant for unknown periods of time. The fact that there were many Miller supporters who were deprived of the guarantee of returning to their old jobs supports the finding of the district court that the decision was not based on political favoritism. Additionally, we think the deci-

sion by the union was a rational and fair way of resolving the competing claims of its members. Clearly a conflict existed between various union members and under either interpretation of the contract the interests of some members would prevail over the interests of others. The union had to make a choice. On the record before us we cannot say that the union's choice was irrational or that it improperly neglected the interests of some of its members. The Supreme Court has made it clear that the duty of fair representation is not breached where the union tried to fairly resolve the sometimes antagonistic claims of its members. *Ford Motor Co. v. Huffman,* 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953); *Humphrey v. Moore,* supra.

Similarly we find the contract interpretation as applied to Tedford to be nonarbitrary. Consistency would seem to require as much. Tedford, however, has the additional claim, as found by the district court, that he relied on the interpretation of the leave of absence provision to the effect that he would get his old job back. As discussed above, the district court's finding of a prior custom to support the existence of such an interpretation is doubtful. And although there is credible evidence that two Peabody officials told Tedford that he could return to his old job, such statements by company officials other than the international president cannot be considered to be a binding interpretation of the leave of absence provision. Finally the interpretation by then President Boyle which can be considered binding (Peabody acquiesced in whatever interpretation the union made) was not communicated to Tedford until after he had taken the union job. For all these reasons the district court's finding of justified reliance by Tedford seems erroneous. However it is not necessary for us to rest our

---

10. See deposition of Trbovich (A. Vol. 2, pp. 502–506).

11. The right of the union and Peabody to reverse a previous interpretation of a contract provision has not been contested. See *Watson v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America,* 399 F.2d 875 (5 Cir. 1968), where it is

stated: "The case law is clear that an oral agreement between the parties to a collective bargaining contract may modify, supplement or amend the collective bargaining contract." (p. 879) See also, *Ford Motor Co. v. Huffman,* 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), where retroactive effect was given to a modification of a collective bargaining agreement.

decision on this basis for even if Tedford had relied on a binding interpretation of the leave of absence provision, this does not mean that the union's reversal of such an interpretation and its consequent application to Tedford was arbitrary.[12] The union in making its decision not to put Tedford back in his old position had a duty to consider not only the interests of Tedford but also those of the twelve employees who would suffer from the resulting rollback, as well as the interest in consistently following an interpretation found by union leaders to be in the best interests of its members.

The fact that the union found Tedford's grievances to be sufficiently lacking in merit to justify arbitration is of no significance in this case. The finding by a judge or jury that a grievance has merit and thus constituted a breach of the duty of fair representation does not, standing alone, give rise to an action as the union's incentive to settle such grievances short of arbitration would be seriously reduced. *Vaca v. Sipes,* 386 U.S. at 192, 195, 87 S.Ct. at 917, 919, 17 L.Ed.2d at 859, 860.

Since Tedford's claim against Peabody remains an action under the Labor Management Relations Act pursuant to § 301 of that Act, 61 Stat. 156, 29 U.S.C. § 185, it must likewise fail. Peabody was bound by the collective bargaining agreement. There was nothing it did, or failed to do, which was beyond the scope of the agreement.[13]

By reason of our action herein it is unnecessary to consider the matter of attorneys' fees allowed by the district court.

REVERSED.

---

12. See *Ford Motor Co. v. Huffman,* 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), where the union was held not to have breached its duty of fair representation by agreeing with the employer to change the collective bargaining agreement (and not simply as here a prior *interpretation* of the agreement) to allow employees seniority credit for preemployment military service, even though this caused layoffs to employees such as plaintiff which otherwise would not have occurred.

13. There is authority to hold the union solely liable under certain circumstances. *Harrison v. United Transportation Union,* 530 F.2d 558 (4 Cir. 1975), cert. denied —— U.S. ——, 96 S.Ct. 1739, 48 L.Ed.2d 203 (1976).