Donald R. HIGDON, Sr., Plaintiff,

v.

UNITED STEELWORKERS OF AMERI-
CA, AFL–CIO–CLC; United Steelwork-
ers of America, Local Union No. 13600;
and Bowman Transportation, Inc., De-
fendants.

No. CV180–166.

United States District Court,
S. D. Georgia,
Augusta Division.

April 12, 1982.

Harris, McCracken & Jackson, William R. McCracken, Augusta, Ga., for plaintiff.

J. R. Goldthwaite, Jr., Atlanta, Ga., Robert H. Stropp, Jr., Birmingham, Ala., for 1st and 2nd defendants.

James W. Wimberly, Jr. and James P. Cobb, Atlanta, Ga., for 3rd defendant.

ORDER

BOWEN, District Judge.

This action under section 301 of the Labor Management Relations Act [LMRA], 29 U.S.C. § 185, for alleged employer violation of a collective bargaining agreement and union breach of its duty of fair representation is presently before the Court on defendants' motions for summary judgment. As gleaned from the record—pleadings, depositions and interrogatories—the following facts, viewed in the light most favorable to plaintiff, emerge as uncontested.

Defendant Bowman Transportation, Inc. [Bowman] is a privately owned corporation engaged in the business of delivering freight as a class one common carrier of general commodities. The corporation has eighty-five terminals located throughout twenty-six states with its headquarters in Atlanta, Georgia. On August 2, 1979, Bowman entered into a three-year collective bargaining agreement with defendant United Steelworkers of America, AFL–CIC–CLC [United Steelworkers or International]. United Steelworkers was the recognized collective bargaining representative of the bargaining unit which consisted of Bowman's truck drivers and other employees. The agreement established a three-step grievance procedure which culminates in binding arbitration for the presentation of unresolved grievances and provides that no bargaining unit employee could be discharged without reasonable cause and makes any discharge grievances subject to the prescribed grievance and arbitration procedure.

For some fourteen years prior to November 2, 1979, plaintiff was employed as a local truck driver at Bowman's Augusta, Georgia, terminal. Plaintiff's primary duties consisted of the pick up and delivery of freight within the Augusta area; this included the loading and unloading of trucks as well as the driving of trucks on short distance routes. As a Bowman employee, plaintiff was a member of the bargaining unit represented by United Steelworkers. As such, he came within the coverage of the aforesaid collective bargaining agreement. The local union for employees at Bowman's Augusta terminal was defendant United Steelworkers of America, Local Union No. 13600 [Local].

On the morning of Friday, November 2, 1979, while in the course of his employment, plaintiff made a delivery of eight or nine cases of shoes to Hanover Shoes, a retail shoe store located in an Augusta shopping mall, and a customer of Bowman. According to plaintiff's deposition testimony, the store manager refused to pay for "inside delivery" of the shoes and told plaintiff to

return at a later time when the manager would have help to take delivery at the loading dock of the shopping mall. Thereupon, plaintiff left, made a delivery elsewhere and attempted, without success, to call his terminal manager concerning the Hanover Shoes incident.

Around noon the same day, plaintiff returned to Hanover Shoes to again make delivery of the shoes. What then transpired is the subject of considerable dispute. On deposition, plaintiff described the second delivery as follows:

> [W]hen I went back, I couldn't get in touch with the [terminal] manager, and I went back and went back to the door and asked him [the store manager] if he wanted the freight, and he said, "Yes, bring it on in," and I brought it in. He told me to write it on that bill, a few cuss words, blowed cigarette smoke in my face, threw my freight bill down, threw my money down, and I told him that I wasn't there to argue with him, that I had a job to do, and that all I wanted was to get the money, the freight bill signed, and get out.

*Plaintiff's Deposition*, at 13. Following this delivery, plaintiff telephoned the assistant terminal manager, Mr. Gerald Cox, related the above-described incident as he viewed it, and was told that the store manager had already called complaining of plaintiff's behavior and that, as a result, the terminal manager wanted plaintiff to return to the terminal.

Upon his return to the terminal, plaintiff reported to the office of the terminal manager, Mr. Robert Widener, Jr., and was told by the manager that a complaint had been lodged against him by Hanover Shoes. Following a brief discussion of the incident, Mr. Widener directed plaintiff to go to the driver's room and to write a statement, word for word, about what had happened at Hanover Shoes. Plaintiff went to the driver's room, but instead of writing a statement, he balled up the paper the terminal manager had given him and threw it in the trash can, "clocked out" and then left the terminal for home. Before leaving, he told

Mr. Cox that he was "too upset" to write the statement and that he would do it later at home after he had "calmed down some." Plaintiff contends he was upset and confused at the time partly because of a chronic back problem which was causing him pain.

After plaintiff left the terminal, Mr. Widener telephoned Bowman's Atlanta headquarters and discussed plaintiff's behavior with Bowman's Director of Safety/Personnel, Mr. Jewell R. Wood. Mr. Wood advised that failure to follow a supervisor's instructions (that is, plaintiff's failure to write a statement as directed) was ground for termination. It appears that "failure to follow instructions" is a prescribed ground for dismissal in "General Rule No. 1" in the set of general rules signed for by every Bowman employee; yet, termination, while the normal "remedy," is not automatic since the terminal manager has some discretion to impose lesser sanctions.

After consulting with Bowman's Safety/Personnel Director, Mr. Widener made the decision to terminate plaintiff and sent a certified letter to plaintiff the same day informing him of the decision. The stated basis for the dismissal was failure to follow a supervisor's instructions. Plaintiff, however, was unable to receive the letter over the weekend; instead, he reported to work the following Monday and was orally informed by the terminal manager of his termination.

The following day, plaintiff met in Atlanta, Georgia, with Mr. William F. Griffin, then president of the local union, and related his version of the events which led to his termination. On behalf of plaintiff, Mr. Griffin filed a "step one grievance" which was subsequently denied by Bowman after its representative met with Mr. Griffin to discuss the matter. Thereafter, the grievance was advanced to "step two" in the prescribed grievance procedure. The "step two" procedure consists of presenting the grievance to a committee, with representatives from both the union and management, which then attempts to settle the grievance.

Prior to the meeting of the "step two" grievance committee, plaintiff discussed the status of his grievance with Mr. Griffin on numerous occasions. As the result of these discussions, plaintiff had the impression that he would shortly regain his employment with Bowman. Indeed, Mr. Griffin testified on deposition that several days before the grievance committee meeting he was informed by Mr. Wood that Bowman would reinstate plaintiff following the "step two" procedure. *Deposition of William F. Griffin*, at 12.

The grievance committee met in Atlanta, Georgia, on December 10, 1979, for approximately four hours, to consider some twenty grievances, including plaintiff's. The committee was comprised of Bowman's vice president of operations, its director of safety/personnel, the local union president and the staff representative for the international, as well as certain other individuals representing Bowman and the unions. When plaintiff's case came for consideration, both sides presented their positions. *Deposition of Jack Strunk*, at 8–9. *Deposition of Ray Huffman*, at 11–12. The union specifically argued that plaintiff's seniority should be a mitigating factor in the discharge decision. At the conclusion of this discussion, Bowman decided to deny the grievance, basing its decision on plaintiff's failure to follow a supervisor's instructions, as well as plaintiff's past performance record including his prior "run-ins" with the terminal manager, all of which, according to Bowman, characterized plaintiff as a "marginal employee." *Deposition of Ray Huffman*, at 15.

Shortly after the December 10, 1979 meeting, Mr. Griffin told plaintiff that the company had changed its mind about reinstating him and that his discharge would stand. Plaintiff was also told that his case was being turned over to the staff representative for United Steelworkers, Mr. Jack Strunk, for a decision on whether to proceed to arbitration. As a matter of union policy, such decisions, which rest solely with the union, are the responsibility of the staff representative. In the interim, Mr. Griffin continued efforts by the union to persuade Bowman to reinstate plaintiff; however, these efforts proved unsuccessful.

Subsequently, following consultation with Mr. Griffin, Mr. Strunk made the decision not to seek arbitration because the case was not "meritorious of going to arbitration." The case was viewed as lacking sufficient merit to warrant arbitration because of plaintiff's undisputed failure to fill out the incident report at the time and manner instructed, and because of the union's prior losing experience with a discharge case brought for arbitration wherein an employee was terminated for refusing to sign a receipt for a warning letter. The local union president concurred with this decision. Throughout the grievance procedure, however, the unions, both local and international, undertook no independent investigation of the events at Hanover Shoes on November 2, 1979.

It is unclear how and when plaintiff was informed of United Steelworkers' decision not to take the case to arbitration. Plaintiff testified that he did not again talk to a union official until May, 1980, when he contacted the newly elected president of the local union, Mr. E. B. Sargent, Sr. Plaintiff complained to Mr. Sargent about the processing of his grievance, and Mr. Sargent undertook to determine its status in mid-June, 1980. Eventually plaintiff and Mr. Sargent went to the National Labor Relations Board [NLRB] in Atlanta, Georgia, and explained the circumstances of the case. Mr. Sargent on deposition described what happened at the meeting as follows: "I gave [the NLRB representative] all the evidence I had, all the evidence that—of course, he [plaintiff] have all the evidence that he had, and their determination to both of us was that he had no case." *Deposition of E. B. Sargent, Sr.*, at 7. According to plaintiff, he did not know for a fact that the case would not be going to arbitration until after this meeting with the NLRB.

The union, through Mr. Sargent, continued in its efforts to persuade Bowman to reinstate plaintiff. By letter dated June 23, 1980, the union requested that Bowman allow the case to proceed to arbitration de-

spite the expiration of the contractual time limits. Bowman replied, however, that because the union had originally voted not to take the case to arbitration, the company would not now reopen the arbitration period. Thereafter, the union ceased all attempts to bring the case to arbitration. At no time during the course of the grievance proceedings did any hostility arise between plaintiff and the unions. Plaintiff maintained friendly relations with all the union personnel involved in the case.

The specific substantive allegations of plaintiff's amended complaint are as follows:

> Plaintiff alleges the facts to be that the defendant union, in breach of their duty of fair representation owing to Plaintiff under the provisions of the Labor-Management Relations Act, 1947, as amended . . ., conspired with the defendant company and each other to permit Plaintiff's discharge to stand, although there was no just cause therefor;

It is further alleged that (1) the negotiations between Bowman and defendant unions were spurious and undertaken in bad faith, (2) the conduct of defendant unions during the grievance process was arbitrary, discriminatory and in bad faith in breach of their duty of fair representation to plaintiff, and (3) plaintiff's discharge by Bowman was in violation of plaintiff's rights under the collective bargaining agreement. Plaintiff seeks monetary damages and reinstatement.

■ It is well settled that under sections 8(b) and 9(a) of the LMRA, 29 U.S.C. §§ 158(b), 159(a), a union, as the exclusive collective bargaining representative of employees in a bargaining unit, has a "statutory duty fairly to represent all of those employees." *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967) (citing *inter alia Ford Motor Co. v. Huffman*, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953)); *see Hines v. Anchor Motor Freight*, 424 U.S. 554, 564, 96 S.Ct. 1048, 1056, 47 L.Ed.2d 231 (1976); *Freeman v. O'Neal Steel, Inc.*, 609 F.2d 1123, 1125 (5th Cir.), *rehearing en banc denied*, 614 F.2d

294 (5th Cir. 1980); *Sanderson v. Ford Motor Co.*, 483 F.2d 102, 109–10 (5th Cir. 1973). Arising from statute, the duty of fair representation [DFR] extends to all union dealings in its representative capacity, not simply to matters pertaining to a collective bargaining agreement. *In re Carter*, 618 F.2d 1093, 1104 (5th Cir. 1980); *Mumford v. Glover*, 503 F.2d 878, 882 (5th Cir. 1974). *Cf. Bass v. International Broth. of Boilermakers*, 630 F.2d 1058, 1063 (5th Cir. 1980) (duty does not extend to an individual's relationship within the union structure).

■■ Pursuant to section 301 of the LMRA, a member employee in the union's represented bargaining unit may maintain an action in federal court against the union for breach of its duty of fair representation where there are corresponding allegations that the collective bargaining agreement was breached. *See Motor Coach Employees v. Lockridge*, 403 U.S. 274, 299, 91 S.Ct. 1909, 1924, 29 L.Ed.2d 473 (1971); *Vaca v. Sipes*, 386 U.S. at 183–188, 87 S.Ct. at 913–915; *In re Carter*, 618 F.2d at 1104. Federal courts also have jurisdiction, by virtue of 28 U.C.D. § 1337, over "bare" DFR claims, *see Smith v. Local No. 25, Sheet Metal Workers Int. Ass'n*, 500 F.2d 741, 748 (5th Cir. 1974), brought by member or nonmember employees in the bargaining unit. *See In re Carter*, 618 F.2d at 1104; *Mumford v. Glover*, 503 F.2d at 882–83. *See also Motor Coach Employees v. Lockridge*, 403 U.S. 274, 299, 91 S.Ct. 1909, 1924, 29 L.Ed.2d 473 (1971) ("[A]n action seeking damages for injury inflicted by a breach of a unions' duty of fair representation [is] judicially cognizable . . . whether or not the lawsuit is bottomed on a collective agreement.").

■ In a section 301 action brought directly against an *employer* for its alleged breach of a collective agreement, the employer may defend on grounds that the employee-plaintiff has failed to exhaust the prescribed remedies under the collective agreement. *Republic Steel v. Maddox*, 379 U.S. 650, 652–53, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1965). As Justice White commented in *Vaca, supra* :

Since the employee's claim is based upon breach of the collective bargaining agreement, he is bound by terms of that agreement which govern the manner in which contractual rights may be enforced. For this reason, it is settled that the employee must at least attempt to exhaust exclusive grievance and arbitration procedures established by the bargaining agreement. *Vaca v. Sipes*, 386 U.S. at 184, 87 S.Ct. at 913. Where, however, the authority to pursue the upper stages of the contractual grievance procedure is vested solely in the union, and the union, in breach of its duty of fair representation, wrongfully refuses to process the grievance, the employee-plaintiff's failure to exhaust his contractual remedies is excused and the section 301 suit against the employer may proceed on the merits. *Vaca v. Sipes*, 386 U.S. at 186, 87 S.Ct. at 914; *Cox v. C. H. Masland & Sons, Inc.*, 607 F.2d 138, 144 (5th Cir. 1979); *Harris v. Chemical Leaman Tank Lines, Inc.*, 437 F.2d 167, 171 (5th Cir. 1971); *Mitchell v. Hercules, Inc.*, 410 F.Supp. 560, 564 (S.D.Ga. 1976).

It is apparent, therefore, that in an action by an employee-plaintiff against both his union and his employer, the DFR issue assumes a dual significance. As stated by the Fifth Circuit: "[A] union's breach of its duty of fair representation may open the way not only to a suit against itself, but also against the employer." *Sanderson v. Ford Motor Co.*, 483 F.2d at 110. Thus, the Court's present task in deciding defendants' motions for summary judgment is to determine, based upon the record, whether, as a matter of law, the union statutory duty of fair representation was not breached. *See Turner v. Air Transport Dispatchers' Association*, 468 F.2d 297 (5th Cir. 1972); *Encina v. Tony Lama Boot Co.*, 448 F.2d 1264 (5th Cir. 1971) (recognizing that summary judgment can be a proper method for disposing of DFR cases where material issues of fact have been settled in the record and only issues of law remain). *See also Smith v. Local No. 25, Sheet Metal Workers Int. Ass'n*, 500 F.2d 741 (5th Cir. 1974).

■ As an initial matter, it is clear that the fair representation rubric does not endow an employee with an absolute right to have any grievance taken to arbitration. *Vaca v. Sipes*, 386 U.S. at 191–92, 87 S.Ct. at 917; *Christopher v. Safeway Stores, Inc.*, 644 F.2d 467, 472 (5th Cir. 1981); *Stanley v. General Foods Corp.*, 508 F.2d 274, 275 (5th Cir. 1975); *Lomax v. Armstrong Cork Co.*, 433 F.2d 1277, 1281 (5th Cir. 1970). Since "[t]he major goal of the duty of fair representation is to identify and protect individual expectations as far as possible without undermining collective interests," *Tedford v. Peabody Coal Co.*, 533 F.2d 952, 956–57 (5th Cir. 1976), the union necessarily is vested with considerable discretion to control the grievance and arbitration process in the presentation of an individual complaint. *Turner v. Air Transportation Association*, 468 F.2d at 299. Thus, in the exercise of its non-ministerial duty, the union is not the servant of any one employee, but rather must represent and consider the interest of all employees in the bargaining unit, *Cox v. C. H. Masland & Sons, Inc.*, 607 F.2d at 142, and "[w]here the individual and collective group interests clash, the former must yield to the latter." *Tedford v. Peabody Coal Co.*, 533 F.2d at 957. In sum,

> in its role as the exclusive agent for all employees in the bargaining unit, the union has the power to sift our frivolous grievances, to abandon processing of a grievance which it determines in good faith to be meritless and to settle disputes with the employer short of arbitration.

*Harris v. Chemical Leaman Tank Lines, Inc.*, 437 F.2d at 171 (footnotes omitted); *see Seymour v. Olin Corp.*, 666 F.2d 202, 208 (5th Cir. 1982) ("[T]he duty of fair representation is not a straitjacket which forces unions to pursue grievance remedies under the collective bargaining agreement in every case where an employee has a complaint against the company.").

■■ The scope of the union's duty, and concomitant breadth of its discretion in processing a grievance, is defined by three distinct standards of conduct: (1) "to serve the interests of all members without hostili-

ty or discrimination toward any," (2) "to exercise its discretion with complete good faith and honesty," and (3) "to avoid arbitrary conduct." *Vaca v. Sipes,* 386 U.S. at 177, 87 S.Ct. at 909; *see Tedford v. Peabody Coal Co.,* 533 F.2d at 957 n.6; *Sanderson v. Ford Motor Co.,* 483 F.2d at 110. Thus, the union "may not arbitrarily ignore a meritorious grievance or process it in a perfunctory manner." *Lomax v. Armstrong Cork Co.,* 433 F.2d at 1281; *see Abilene Sheet Metal, Inc. v. NLRB,* 619 F.2d 332, 347 (5th Cir. 1980). In order to prevail on a breach-of-duty claim, therefore, the employee-plaintiff must show that the union's conduct toward him was discriminatory, in bad faith, or arbitrary. *Wells v. Southern Airways, Inc.,* 616 F.2d 107, 109 (5th Cir. 1980); *see also Mitchell v. Hercules, Inc.,* 410 F.Supp. at 567 ("Other nebulae in the 'semantic universe' of the unfair-representation exception are fraud, ... dishonesty, gross mistake, futility and collusion.").

In the present case, the record is devoid of any facts to support a finding that the unions were motivated by hostility or discrimination toward plaintiff in deciding not to pursue arbitration. Plaintiff testified on deposition that his relationship with all involved union personnel was friendly and that no hostility existed. Similarly, plaintiff's grievance was not singled out by the union and accorded discriminatory or disparaging treatment. Indeed, the record shows continued and aggressive efforts by the two local union presidents to procure plaintiff's reinstatement following each of the first two steps of the grievance procedure.

■ A review of the record also shows no genuine issue of material fact that defendant unions acted in bad faith, that is, without honest purpose and judgment. *See Freeman v. O'Neal Steel, Inc.,* 609 F.2d at 1128 n.9. Even assuming carelessness or inadvertence on the part of the union in processing plaintiff's grievance, such conduct does not, without more, constitute a DFR breach. *Coe v. United Rubber, Cork, Linoleum & Plaster,* 571 F.2d 1349, 1350–51 (5th Cir. 1978). The union, as employee representative in the grievance and arbitra-

tion procedure, is not a lawyer, *id.* at 1127, and is not held to standards which might otherwise apply to legal counsel.

■ Here, the union in good faith undertook to investigate plaintiff's grievance and determine its merits. *See Cox v. C. H. Masland & Sons, Inc.,* 607 F.2d at 145 ("[A] union's discretion is confined by the duty to investigate the grievance and determine its merit."). While plaintiff makes much over the unions' failure to conduct an independent investigation of the Hanover Shoes incident, that incident was not the cause of plaintiff's discharge. Plaintiff was specifically discharged for failure to follow a supervisor's instructions. It is undisputed that the unions heard and considered both plaintiff's and Bowman's versions of events at Bowman's Augusta terminal on the afternoon of November 2, 1979. Further investigation was not required since plaintiff well conceded the possible verity of Bowman's version. *See Deposition of plaintiff,* at 29. Following the step two procedure, the union determined that plaintiff's failure to complete the incident report as requested was sufficient ground for termination. *See Deposition of Jack Strunk,* at 11.

In view of the foregoing, the final area of inquiry is whether the decision by the staff representative of the international not to take the grievance to arbitration was "arbitrary." While the arbitrariness standard is somewhat nebulous, the Fifth Circuit has concluded that:

> a decision to be nonarbitrary must be (1) based upon relevant, permissible union factors which excludes [*sic*] the possibility of it being based upon motivations such as personal animosity or political favoritism; (2) a rational result of the consideration of those factors; and (3) inclusive of a fair and impartial consideration of the interests of all employees.

*Tedford v. Peabody Coal Co.,* 533 F.2d at 957 (footnotes omitted); *see Seymour v. Olin Corp.,* 666 F.2d at 208. *See also Mumford v. Glover,* 503 F.2d at 885 ("[E]vidence of nadiral disinterest in the desires of membership might make out a case of arbitrary treatment."). As applied to the undisputed facts in the present case, this three-pronged

test shows that defendant unions' conduct was not arbitrary.

The unions in good faith determined that the grievance was without merit and would not succeed in arbitration. Certainly, "the union is entitled to weigh the costs and benefits of going to arbitration, including the chances of success and monetary cost." *Cox v. C. H. Masland & Sons, Inc.*, 607 F.2d at 145. The staff representative based his decision in part on an unsuccessful prior arbitration case which presented a similar discharge grievance. Such factors are clearly relevant and permissible; there is no evidence whatsoever that the decision not to arbitrate was based upon motivations such as personal animosity or political favoritism. Additionally, there are no facts in the record to suggest that the decision was anything but a rational result of the consideration of these factors, "inclusive of a fair and impartial consideration of the interests of all employees."

Accordingly, on the basis of the foregoing discussion, in the context of the undisputed facts in the case, the Court finds as a matter of law that the defendant unions did not breach the duty of fair representation as alleged. Summary judgment is therefore GRANTED in favor of defendants and against plaintiff. Each party shall bear their own costs.