**Dr. Fernando COMMODARI, Plaintiff,**

v.

**LONG ISLAND UNIVERSITY and Long Island University Faculty Federation, Local 3998, NYSUT, AFT, AFL–CIO, Defendants.**

Civil Action No. CV–99–2581 (DGT).

United States District Court,
E.D. New York.

March 31, 2000.

358

Dr. Fernando Commodari, Brooklyn, NY, pro se.

Thomas S. Baylis, James G. Ryan, Cullen & Dykman, Garden City, NY, for Defendant Long Island University.

Mitchell H. Rubinstein, Office of General Counsel, New York State United Teachers, New York City, for Defendant Long Island University Faculty Federation.

## REVISED MEMORANDUM AND ORDER

TRAGER, District Judge.

Plaintiff pro se Fernando Commodari, Ph.D. ("Dr. Commodari") originally brought this hybrid Labor Management Relations Act § 301/duty of fair representation action against defendants Long Island University ("LIU") and the Long Island University Faculty Federation (the "Union"), alleging that he was terminated in violation both of the collective bargaining agreement ("CBA") between LIU and the Union and a 1998 arbitral decision rendered in his favor. Both defendants filed motions to dismiss and/or for summary judgment.

Pending decision on those motions, plaintiff, with leave of the court, amended his complaint to allege national origin discrimination in violation of § 1983, § 1981, Title VI, and Title VII against both defendants. In response, LIU filed a motion to dismiss the employment discrimination claims, and the Union filed a motion to dismiss and/or for summary judgment on those same claims. The court now decides both sets of motions.

### Background

Dr. Commodari was appointed to the position of assistant professor in the Chemistry Department at LIU's Brooklyn campus in the fall of 1996 and was subsequently reappointed for the 1997/1998 fiscal year. In the fall of Dr. Commodari's second year teaching at LIU, the department conducted a mandatory yearly review as required by the CBA. In a split vote, the Chemistry Department Personnel Committee recommended that he be reappointed for a third year at LIU. His department chairman, however, disagreed.

Under the terms of the CBA, when the department chairman and the department personnel committee give conflicting recommendations on reappointment, a professor's case must be submitted to a third, multidisciplinary organ, the Faculty Review Committee ("FRC"), whose decision will resolve the conflict. (CBA art. VIII, § 2(f).) On November 24, 1997, Dr. Commodari was given notice of termination effective August 31, 1998, despite the fact that his case had not yet been submitted to the FRC.

Dr. Commodari filed a grievance with the Union, which, pursuant to the CBA, brought the matter to arbitration. On July 6, 1998, the arbitrator issued a decision in Dr. Commodari's favor, holding that LIU had violated the CBA by terminating Dr. Commodari without having convened a meeting of the FRC to resolve the conflicting recommendations of the department chairman and the department personnel committee. *See Long Island Univ. Faculty Fed'n v. Long Island Univ.*, No. 13–390–00778–98 (Am. Arb'n Ass'n July 6, 1998) (Adelman, Arb.). The arbitrator ordered that Dr. Commodari be reappointed "to a probationary position in the Chemistry department for the 1998–99 academic year" and admonished LIU to "follow the reappointment procedures under the [CBA]" in the future. *Id.* at 9. The arbitrator did not, however, review the merits of Dr. Commodari's performance as an assistant professor. *See id. passim.*

In accordance with the arbitrator's decision, Dr. Commodari was appointed to a third year of probationary employment, which was to begin September 1, 1998, and end on August 31, 1999.

In early August 1998, an additional review of Dr. Commodari's performance was conducted, with the result that on August 17, 1998, LIU sent Dr. Commodari a notice of termination effective August 31, 1999. The effect of the August 17, 1998 notice was, thus, to deny Dr. Commodari a fourth year of probationary employment at LIU.

On January 20, 1999, Dr. Commodari filed a formal grievance with the Union, protesting this latest notice of termination. This time, however, the Union declined to pursue his grievance.

On May 5, 1999, Dr. Commodari, who was initially represented by counsel, brought this action against LIU and the Union, alleging that the August 17, 1998 termination notice did not conform to the reappointment procedure specified in the CBA and, hence, violated the July 6, 1998 arbitral award. With regard to the Union, Dr. Commodari claimed that the Union's failure to pursue his grievance constituted a breach of the Union's duty of fair representation.

On August 25, 1999, Dr. Commodari, acting pro se, moved for a temporary restraining order and/or preliminary injunction enjoining LIU from terminating him on August 31, 1999.[1] In response, LIU and the Union cross-moved to dismiss and/or for summary judgment.

On September 22, 1999, Dr. Commodari, who is of Italian ancestry, filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") against LIU. In the charge, Dr. Commodari alleged that LIU had terminated his employment because of his national origin. In addition, Dr. Commodari alleged that LIU retaliated against him for opposing discriminatory hiring practices. Six days later, on September 28, 1999, the EEOC issued a right-to-sue letter to Dr. Commodari on his charge against LIU.

On that same day, Dr. Commodari filed a charge of discrimination with the EEOC against the Union. In the charge, Dr. Commodari alleged that the Union had been a party to LIU's discrimination against him. Two days later, on September 30, 1999, the EEOC issued Dr. Commodari a right-to-sue letter on the charge against the Union.

On October 12, 1999, oral argument was held on both Dr. Commodari's motion for a preliminary injunction and on the defendants' cross-motions for summary judgment. As stated on the record, Dr. Commodari's motion for a preliminary injunction was denied on the grounds that he had not established a likelihood of success on the merits. (Tr. 46–47.)

In support of their cross-motions for summary judgment, defendants raised procedural arguments based on exhaustion and standing, in addition to a substantive argument based on the interpretation of the CBA and the arbitral decision. In papers submitted prior to oral argument, Dr. Commodari contested the defendants' interpretation of the CBA and further suggested that actual past practice with respect to review and notice procedures differed from that urged by defendants. In response, the Union submitted an affidavit by its President, Dr. Rhiannon Allen ("Dr.Allen"), in which she cited a number of termination decisions involving other assistant professors that she claimed supported the defendants' interpretation of the CBA. At oral argument, Dr. Commodari raised a substantial issue with regard to the accuracy of Dr. Allen's affidavit, and defendants' motions were denied. Defendants were, however, given leave to renew their motions upon submission of university personnel records that verified Dr. Allen's affidavit.

On November 5, 1999, LIU submitted various personnel records in response to

---

**1.** Dr. Commodari dismissed his attorney as a result of a disagreement over the wisdom of moving for interim injunctive relief.

the court's directive, and defendants renewed their motions for summary judgment on Dr. Commodari's § 301/fair representation claim shortly thereafter.

Pending decision on the defendants' motions for summary judgment, plaintiff, by leave of court, amended his complaint to plead national origin discrimination in violation of the § 1983, § 1981, Title VI, and Title VII against both LIU and the Union, as well as retaliation claims against LIU.

On November 30, 1999, the Union filed a motion to dismiss and/or for summary judgment on the Amended Complaint

On December 3, 1999, LIU filed a motion to dismiss the Amended Complaint.

## Discussion

### (1)

### Applicable Standards of Review

#### a. Motion to Dismiss vs. Motion for Summary Judgment

With the exception of LIU's motion to dismiss the employment discrimination claims of plaintiff's Amended Complaint, defendants style their motions as "motions to dismiss and/or for summary judgment." Pursuant to Fed.R.Civ.P. 12(b), the latter motions will be treated as motions for summary judgment inasmuch as defendants' arguments are not confined to the pleadings, but, instead, rely on affidavits from university and union officials, as well as documentary evidence concerning past review and termination practice at LIU. See Fed.R.Civ.P. 12(b). Plaintiff has received a copy of the Notice to Pro Se Litigants required by Local R. Civ. P. 56.2 and has been given a reasonable opportunity to present all material pertinent to his opposition to summary judgment.[2]

LIU's motion to dismiss the employment discrimination claims, however, is not styled in the alternative as a motion for

summary judgment and does not present matters outside the Amended Complaint. LIU's motion on Dr. Commodari's employment discrimination claims, therefore, will be decided under the standards applicable to a motion to dismiss pursuant to Rule 12(b)(6). See Fed.R.Civ.P. 12(b).

#### b. Standard for Summary Judgment

Fed.R.Civ.P. 56(c) provides that summary judgment "shall be rendered forthwith" if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322–328, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–252, 106 S.Ct. 2505, 2510–12, 91 L.Ed.2d 202 (1986). A genuine issue of material fact exists if the evidence in the record would allow a reasonable jury to return a verdict for the non-moving party. See Anderson, 477 U.S. at 248, 106 S.Ct. at 2510. In making this determination, the non-moving party's evidence must be credited, and all justifiable inferences are to be resolved in his favor. See id. at 255, 106 S.Ct. at 2513. However, the existence of a mere scintilla of evidence in support of his position is insufficient; the non-moving party must produce admissible evidence on which a jury could reasonably find in his favor. See id. at 252, 106 S.Ct. at 2512. Moreover, while a pro se plaintiff's papers must be read liberally, see Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 795 (2d Cir.1999), he must still provide evidentiary support, rather than mere assertions, in order to overcome a motion for summary judgment, see Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir.1991). Thus, a pro se plaintiff faced with a summary judgment motion "may not rest upon the mere allegations" of his complaint to defeat a motion

---

**2.** Indeed, the court has placed no limits on the number of briefs or materials it has allowed plaintiff to submit. Plaintiff has taken full advantage of this procedural leeway during the seven months since the first of the

defendants' motions were served, having filed numerous replies and sur-sur-replies with the court, as well as a substantial number of evidentiary documents, including various letters, e-mails, and personnel records.

for summary judgment. Fed.R.Civ.P. 56(e); *see Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir.1996) (holding that Rule 56(e) applies to pro se plaintiffs who have received adequate notice of the nature and consequences of a motion for summary judgment).

### c. Standard for Dismissal Pursuant to Rule 12(b)(6)

Upon a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a complaint should not be dismissed unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

> In ruling on such a motion, the court is to look only to the allegations of the complaint and any documents attached to or incorporated by reference in the complaint, to assume all well-pleaded factual allegations to be true, and to view all reasonable inferences that can be drawn from such allegations and documents in the light most favorable to the plaintiff.

*Dangler v. New York City Off Track Betting Corp.*, 193 F.3d 130, 138 (2d Cir.1999) (citations omitted). Moreover, in evaluating whether a plaintiff has sufficiently alleged facts which, if true, would entitle him to relief, complaints prepared by pro se litigants should be held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972) (per curiam); *see Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir.1997).

### (2)

### The § 301/Fair Representation Claim

Defendants have contested the merits of Dr. Commodari's § 301/fair representation action and, in addition, have urged throughout these proceedings that Dr. Commodari is procedurally barred from bringing the action because of his alleged failure to exhaust his remedies under the

CBA and a lack of standing to enforce the arbitral award. Because Dr. Commodari's claim is readily decided on the merits, this court will not reach defendants' procedural arguments, though, as noted at the October 12, 1999 conference, defendants' exhaustion argument appears to have merit, (Tr. 52).

### a. Applicable Law

 Under federal labor law, an employee may bring a complaint against his union and/or his employer alleging (1) that the employer breached a collective bargaining agreement and (2) that the union breached its duty of fair representation in redressing his grievance against the employer. *See DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 163–64, 103 S.Ct. 2281, 2289–91, 76 L.Ed.2d 476 (1983); *Vaca v. Sipes*, 386 U.S. 171, 184–86, 87 S.Ct. 903, 913–15, 17 L.Ed.2d 842 (1967); *White v. White Rose Food*, 128 F.3d 110, 113 (2d Cir.1997). Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1998), governs the employer's duty to honor the collective bargaining agreement, and the duty of fair representation is implied by § 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a) (1998). *See DelCostello*, 462 U.S. at 164, 103 S.Ct. at 2290–91; *White Rose Food*, 128 F.3d at 113; *Price v. International Union, United Auto. Aerospace & Agric. Implement Workers*, 795 F.2d 1128, 1134 (2d Cir.1986). The plaintiff may sue the union or the employer, or both, but must allege violations on the part of both. *See DelCostello*, 462 U.S. at 165, 103 S.Ct. at 2291; *White Rose Food*, 128 F.3d at 114.

### b. Dr. Commodari's termination did not violate the CBA or the arbitrator's award.

 For the reasons set forth on the record at the October 12th argument, the defendants' interpretation of CBA is the better, and indeed the only plausible, reading of the plain language of the CBA. To

briefly recapitulate the court's holdings on this point, the CBA required that Dr. Commodari be given notice of termination prior to September 1 of his third year, i.e., September 1, 1998, in order for LIU to validly deny him reappointment for his fourth year of employment, i.e., the 1999/2000 fiscal year.[3] In this case, LIU did just that by sending Dr. Commodari notice on August 17, 1998, advising him that he would not be reappointed to a fourth year of employment and that his employment would terminate on August 31, 1999. (Pl.'s Mem. Opp. Defs.' Mots. Summ. J./Dismiss, Ex. I [hereinafter Pl.'s Mem. Opp. I].)

Dr. Commodari's argument that such a procedure would render meaningless the mandatory third-year review, which the CBA requires in the fall of a probationary employee's third year, (CBA art. VIII, § 2(c)), is undercut by the plain language of Article IX, § 1 of the CBA, which specifies that employees must be given notice of termination by September 1st of the year preceding the year in which the termination is to become effective, and by evidence LIU presented that notices of termination given to assistant professors prior to a given year of employment have, on occasion, been rescinded on the basis of a favorable review in the subsequent year, (Letter from Thomas S. Baylis to Chambers of 10/29/99 with supporting personnel records, at 2 (citing the cases of Professors Donahue and Knight)). Dr. Commodari has provided no evidence of a contrary practice.

Indeed, a contrary practice—one in which a third-year or more senior employee could be given a notice of termination during his $n$ th year, after a review conducted in the fall of that $n$ th year, denying the employee an $(n + 1)$th year of employ-

ment—would undercut the bargained-for notice procedure outlined in Article IX, which is designed to ensure that more senior probationary faculty members be given at least one year of notice before their termination becomes effective, thus allowing them to time to find new employment in what is a cyclical job market, (Tr. 52).

Finally, a reading of the CBA that attempted to accommodate both Dr. Commodari's argument that a second-year employee can only be given a notice of termination after the mandatory third-year review and the notice schedule set out in Article IX, § 1 would lead to the absurd consequence that LIU can never deny a second-year employee a fourth year of employment: Any notice sent to a third-year employee after the third-year review would necessarily be a notice sent after September 1st of the employee's third year, and therefore, under Article IX, that notice could not become effective until August 31st, i.e., the last day, of the employee's fourth year.

In his later papers, Dr. Commodari appears to concede that LIU can, under certain circumstances, deny a probationary employee a fourth year of employment. However, Dr. Commodari asserts that LIU's past practice under the CBA has actually been to give second-year and more senior employees at least *fifteen* months of notice before terminating them, rather than the twelve months specified in the CBA.[4] Thus, Dr. Commodari argues that he could have been properly terminated effective the last day of his third year only if he had received notice of termination as of May of his second year. Dr. Commodari observes that most of the personnel records produced by LIU show that third-year and more senior employees who

---

**3.** (CBA art. IX, § 1 (specifying termination notice deadlines); *id.* art. XIV, § 2(a) (providing that "the term of appointment of full-time teaching members of the unit is the University's fiscal year, September 1 to August 31, for which the annual salary is paid").)

**4.** (Pl.'s Mem. Opp. I, Ex. B, ¶¶ 16–17. *See generally* CBA art. II, § 3 ("All *bona-fide* past practices of the Brooklyn Campus shall be continued and deemed a part of this Agreement.").)

were not reappointed received their notices of termination in April or May of their second-to-last year of employment. (Letter from Dr. Commodari to Chambers of 2/14/00, attached chart.)

Crucially, however, not all terminations conform to this pattern. In case of Professor Mehr Azar Tadayyoni ("Dr. Tadayyoni"), a third-year assistant professor in the Chemistry Department, the department personnel committee met on May 15, 1990, and determined not to recommend her reappointment for the 1991/1992 year. (Letter from Thomas S. Baylis to Chambers of 11/18/99 with supporting personnel records, at 2 [hereinafter LIU Nov. Letter]; Arons Reply Aff. of 9/28/99, Ex. A, at 2–3.) In a subsequent meeting on July 9, 1990, the committee reaffirmed its May 15th determination. (*Id.*) The chairman of the department forwarded the department personnel committee's review and recommendation along with his concurrence to the dean on July 16, 1990. (*Id.*) As a result, by letter dated August 22, 1990, LIU's then vice president for academic affairs, advised Dr. Tadayyoni that she would be terminated as of August 31, 1991, only *twelve* months later. (*Id.*) Subsequently, Dr. Tadayyoni was, in fact, terminated on August 31, 1991. (*Id.*) Similarly, Professor Robert Erler was given notice of termination on July 21, 1997 that he would be terminated effective August 31, 1998— only *thirteen* months later, and he was, in fact, terminated on August 31, 1998. (*Id.* at 3.) Thus, it was not unprecedented for LIU to send notices of termination after May of an employee's $n$th year that became effective on August 31st of the employee's $(n + 1)$th year.

Moreover, there is a perfectly innocent explanation of why, in this case, Dr. Commodari was not given notice of termination in April or May of 1998: As of April and May of his second year, the arbitrator had not yet rendered his decision on Dr. Com-

modari's November 1997 notice of termination. University officials, therefore, believed that he had already been given a valid notice of termination that would become effective on the last day of his second year.[5] (*Id.* at 2.) Accordingly, it would make no sense for LIU to send a notice of termination in April or May of Dr. Commodari's second year that would be effective on the last day of a third year of employment that he had already been denied. Dr. Commodari's arguments based on the length of the notice period and the effect of the mandatory third-year review, thus, fail to raise an issue for trial.

Dr. Commodari, however, advances a number of independent arguments that purport show that the review and notice of termination he received during the summer of his second year was invalid. Dr. Commodari's reasoning stems from a fanciful interpretation he has placed on the arbitrator's decision and a number of extraordinary consequences he draws from that interpretation. Dr. Commodari repeatedly characterizes the arbitrator's decision as having "placed him in his third year." (*E.g.*, Pl.'s Mem. Opp. I, Ex. A, ¶¶ 29, 30, 32; *id.*, Ex. B, ¶ 25.) As best as can be discerned from Dr. Commodari's papers, what Dr. Commodari means by this phrase is that the July 6, 1998 decision had the effect of conferring third-year status on him as of the date of the decision; that is, he seems to believe that, as of July 6, 1998, he was already deemed to be "in" his third year of employment, despite the fact that the 1998/1999 fiscal year did not actually begin until September 1, 1998, (CBA art. XIV, § 2(a)). As a result, in Dr. Commodari's view, the notice of termination he received on August 17, 1998 should be deemed a notice received in his third year, but before his third-year review, and thus one that could not become effective until the last day of what would have been his fourth year, i.e., August 31,

---

**5.** The CBA permits the university to send a notice of termination to a second-year employee that becomes effective on the last day of his second year, provided that it is sent prior to December 1st of his second year. (CBA art. IX, § 1.)

2000, *a fortiori,* one that could not become effective on August 31, 1999, as the notice purported. On this understanding, the cases that LIU has cited of employees in their $n$th years who received notices of termination in April or May of their $n$th year, after their $n$th-year review, which did not become effective until August 31 of their $(n+1)$th year, would indeed show that his case represented a departure from precedent.[6] Dr. Commodari, however, was *not* a third year employee who was given notice of termination, before his third year review, that was to become effective on August 31st of his third year. As of August 17, 1998, Dr. Commodari was a *second-year* employee who had just been given notice of termination effective on August 31st of his third year. (Pl.'s Mem. Opp. I, Ex. Q, at 1.)

The problem with Dr. Commodari's reasoning is that it is based on a wildly mistaken premise. Dr. Commodari repeatedly asserts in his papers that he "cannot have a 'second second year review' ... if the arbitrator placed me in my third *academic* year." (*E.g., id.,* Ex. B, ¶ 25.) The arbitrator's decision, however, did not effect an instantaneous change in Dr. Commodari's level of seniority. Dr. Commodari has not cited any language from the decision to support this contention, and, indeed, there is none. The arbitrator's decision simply commanded LIU to reappoint Dr. Commodari for the 1998/1999 year, i.e., to give him a third year of employment. (*Id.,* Ex. H, at 9.) Although the decision barred LIU from taking any subsequent action terminating his third year of employment, it did not prohibit LIU from giving him, while he was still in the remaining two months of his second year, a notice of termination denying him

reappointment to his fourth year, provided, of course, that any review culminating in the notice of termination complied with the procedures dictated by the CBA.

Dr. Commodari raised an additional argument attacking the propriety of his termination that was disposed of at the October 12th argument, but which, for the sake of completeness, will be repeated here. Dr. Commodari, through an affidavit given by one of his colleagues, states the arbitrator's decision "nullifie[d]" not only any adverse action taken against him before the date of the decision, but also any action taken against him between the date of the decision and September 1, 1998. (*Id.,* Ex. U, Biamonte Aff. ¶ 1.) This argument, again, rests on a misunderstanding of the arbitrator's decision, the source of which is not apparent. Dr. Commodari appears to believe that the arbitrator's decision was a substantive repudiation of LIU's grounds for denying him reappointment. (*Id.* (asserting that, as result of the arbitrator's decision, Dr. Commodari's record was a "tabula rasa" until the 1998/1999 "academic year," which began on September 3, 1998[7]).) Dr. Commodari then apparently reasons that since the second second-year review that led to his August 17, 1998 termination notice occurred during the summer—when he had no teaching duties—it necessarily must have been based on no grounds at all or, alternatively, must have relied on the same grounds for termination that LIU had relied on in November of 1997, which the arbitrator rejected. (*E.g., id.,* Ex. B, ¶ 25 ("What was I 'second' reviewed for in the summer of 1998, when I was not teaching at LIU?").)

The arbitrator's decision, however, did nothing of the sort. The arbitrator's deci-

---

6. Equally telling would be former Union President Dennis M. Curley's affidavit stating that he did not know of any instance in the last ten years in which a third-year employee was given notice of termination before his third year review that became effective on August 31st of the employee's third year. (Pl.'s Mem. Opp. I, Ex. R.)

7. Article XIV, § 2(a) of the CBA distinguishes between the university's "fiscal year" and its "academic year." The fiscal year runs from September 1st to August 31st, while the academic year runs from the first Tuesday in September until the day following the spring commencement or June 30th, whichever comes first.

sion did not address the merits of Dr. Commodari's employment at all, but is based strictly on LIU's violation of the CBA's review and notice procedures. (*Id.,* Ex. H.) Indeed, it could not have, for the arbitrator's jurisdiction extends only to procedural violations under the CBA. (CBA art. XXVIII, § 4(c) (providing that arbitrability of any grievance involving reappointment "shall be limited solely to procedural issues").)

■ Dr. Commodari makes two additional arguments intended to show that, as general matter, no university employee can be fired during the summer. First, Dr. Commodari argues that "technically" he was not "on contract" with LIU during the summer and, therefore, any employment decision made by LIU during the summer is a nullity. (*E.g., id.,* Ex. B, ¶ 25.) The basis for Dr. Commodari's argument that he was not on contract during the summer seems to stem, again, from the fact that he was not assigned teaching duties during the summer. (*Id.* (citing CBA art. XIV, § 2(a) (stating that "full-time teaching unit members are normally assigned teaching and other professional responsibilities during the academic year")).) Thus, to Dr. Commodari's mind, he was on contract with LIU only during the "academic year" as defined in the CBA. (*Id.*)

The argument is frivolous. The CBA clearly states that "the term of appointment of full-time teaching members of the unit is the University's fiscal year, September 1 to August 31, for which the annual salary is paid," (CBA art. XIV, § 2(a)), and Dr. Commodari's November 1997 termination notice clearly specifies that the term of his employment would run through August 31, 1998, (Pl.'s Mem. Opp. I, Ex. C). Moreover, Dr. Commodari was, in fact, paid on a monthly basis throughout the summer of 1998. (LIU Nov. Letter, *supra,* at 4.) The fact that Dr. Commodari had no active teaching duties during the summer did not legally or contractually preclude LIU from reviewing and termi-

nating one of its payrolled employees during the summer.

Dr. Commodari's next argument for the per se invalidity of a summer review, viz., that a review conducted during the summer is unprecedented, is refuted by the example of Dr. Tadayyoni, a third year professor who received a second third year review during the summer of her third year. (*Id.* at 2.) In an attempt to distinguish Dr. Tadayyoni's treatment from his own, Dr. Commodari asserts (in a chart comparing the timeline of his review and termination with other former LIU employees) that Dr. Tadayyoni's review was completed by, and her final notice of termination received in, May of her third year, i.e., within the "academic year." (Letter from Dr. Commodari to Chambers of 2/14/00, attached chart.) In fact, Dr. Tadayyoni had only received notice of the initial decision of her department's personnel committee as of May 18th. (Arons Reply Aff. of 9/28/99, Ex. A, at 2.) Her department chairman did not make a recommendation until July 16th, (*id.* at 2–3), and Dr. Tadayyoni did not actually receive formal notice of termination until August 22nd, i.e., outside the "academic year," (LIU Nov. Letter, *supra,* at 2).

Moreover, there is no language in the CBA that precludes a review during the summer. Article VIII, which prescribes the review procedures speaks only in terms of a review being given during "each *year* of probationary employment," (CBA art. VIII, § 2(a) (emphasis added)); it does not provide that reviews are to be given during each "academic year," (*see id.*).

Dr. Commodari's final argument relates to an alleged impropriety, not in his second second-year review, but in the mandatory review he received in the fall of his third year. Dr. Commodari asserts that, in violation of the CBA and the arbitrator's decision, he was never given a valid third-year review. The CBA provides that each third year probationary faculty member must be "formally reviewed by [sic] de-

partment personnel committee, the [department] chairperson, the FRC, the dean and the President or his/her designee." (CBA art. VIII, § 2(c).) Thus, whereas in years other than the third, the FRC reviews a probationary faculty member's performance only in the event of a disagreement between the department chairperson and the department personnel committee (in which case, the FRC's function is to make the tie-breaking recommendation on reappointment) (*id.* art. VIII, § 2(f)), FRC review is a mandatory component of the third year review. The apparent purpose of this more elaborate third-year review is to give a probationary faculty member who is mid-way through the seven-year tenure track additional feedback regarding his performance.

With respect to his third-year review papers, Dr. Commodari observes that the section of the FRC evaluation form marked "Recommendation" was left blank. (Pl.'s Mem. Opp. I, Ex. L.) From this fact, Dr. Commodari concludes that he was never given a review by the FRC that met the requirements of Article VIII, § 2(c) of the CBA.

In support of his argument that this field must be, and usually is, filled out in a proper third-year, FRC review, Dr. Commodari has produced the FRC review sheet for one Dr. Julie Trachman. (*Id.*, Ex. M.) Far from proving his point, an examination of the remarks included in Dr. Trachman's "Recommendation" section shows that the "Recommendation" included here is not the FRC's recommendation to the dean on reappointment, but rather a recommendation *to the employee*, giving suggestions on steps that the employee can take to increase his or her chances of future reappointment and tenure. Dr.

Trachman's FRC "Recommendation" reads:

> The FRC commends Dr. Trachman for her scholarly efforts and recommends that she indicate any memberships in professional organizations. The FRC also recommends that Dr. Trachman become more active in her department and on the wider campus. It would also be helpful to provide supporting documents for both peer and student evaluations.

(*Id.*) Given that Dr. Commodari's department chairman and the Chemistry Department Personnel Committee had already both recommended that Dr. Commodari not be reappointed by the time his case reached the FRC for review, it would have made no sense for the FRC to make suggestions to Dr. Commodari regarding his future conduct at LIU when the FRC knew that he would no longer be employed at LIU as a consequence of the those recommendations.

In sum, none of Dr. Commodari's several arguments provide any support for his interpretation of the CBA or the arbitrator's decision, nor do they show that there is any genuine issue of material fact regarding LIU's alleged breach of the CBA. Accordingly, LIU's motion for summary judgment on Dr. Commodari's § 301 claim is granted.

**c. The Union did not breach its duty of fair representation in declining to pursue Dr. Commodari's grievance.[8]**

■ A union has a duty to represent fairly all employees subject to the CBA. *See Spellacy v. Airline Pilots Ass'n–Int'l,* 156 F.3d 120, 126 (2d Cir.1998) (citing *Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 74, 111 S.Ct. 1127, 1133–34, 113 L.Ed.2d 51 (1991)). This duty encompass-

---

**8.** Because a hybrid § 301/fair representation claim requires a showing of breach on the part of both the employer and the union, this court's holding that LIU did not breach the CBA is dispositive of Dr. Commodari's fair representation claim against the Union. *See DelCostello,* 462 U.S. at 165, 103 S.Ct. at 2291; *White Rose Food,* 128 F.3d at 114.

Nonetheless, for the sake of completeness, the merits of his fair representation claim against the Union will be independently reviewed. This court's alternative holding that the Union did not breach its duty of fair representation is, of course, likewise dispositive of Dr. Commodari's § 301 claim against LIU. *See id.*

es both the negotiation and the enforcement of the CBA. *See Vaca*, 386 U.S. at 177, 87 S.Ct. at 909–10; *Spellacy*, 156 F.3d at 126.

A union breaches its duty of fair representation only if its actions are either "arbitrary, discriminatory, or in bad faith." *O'Neill*, 499 U.S. 65, 67, 111 S.Ct. 1127, 1130, 113 L.Ed.2d 51 (1991); *Vaca*, 386 U.S. at 190, 87 S.Ct. at 916–917; *Lewis v. Tuscan Dairy Farms, Inc.*, 25 F.3d 1138, 1141 (2d Cir.1994). "[A] union's actions [may be found] arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *O'Neill*, 499 U.S. at 67, 111 S.Ct. at 1130 (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953)). Consequently, judicial review of union action " 'must be highly deferential, recognizing the wide latitude that [unions] need for the effective performance of their bargaining responsibilities.' " *Gvozdenovic v. United Air Lines, Inc.*, 933 F.2d 1100, 1106 (2d Cir.1991) (quoting *O'Neill*, 499 U.S. at 78, 111 S.Ct. at 1135).

In accordance with these principles, the court need not find on the merits that the union's interpretation of the CBA is correct; rather, the court's inquiry "is limited to whether the union took a position on the basis of an informed, reasoned judgment regarding the merits of the [union member's] claim in light of the language in the collective bargaining agreement." *Spellacy*, 156 F.3d at 127 (citing *Tedford v. Peabody Coal Co.*, 533 F.2d 952, 957 (5th Cir.1976)). In addition, where a union member complains that the union failed to pursue his grievance, the union breaches its duty of fair representation only where it " 'arbitrarily ignore[s] a meritorious grievance or process[es] it in perfunctory fashion.' " *Id.* at 128 (quoting *Vaca*, 386 U.S. at 191, 87 S.Ct. at 917, and noting that "union members do not have an 'absolute right to have [their] grievances taken to arbitration' ").

Dr. Commodari argues that the Union breached its duty of fair representation by arbitrarily declining to pursue his grievance. The substance of Dr. Commodari's argument is utterly frivolous. Dr. Commodari compares the language that he used in his request that the Union pursue a grievance with respect to his November 1997 termination notice with the language that he used in his request related to the August 1998 notice, observes that the language he used on the two occasions was similar, and notes that on the first occasion, the Union pursued his grievance, while on the second occasion, it did not. (Letter from Dr. Commodari to Chambers of 9/29/99, at 1.) Ergo, since Dr. Commodari made what was linguistically the same request on both occasions and the Union responded differently to the two requests, its action on the second occasion was arbitrary.

The point, of course, is that the Union had a reason to pursue his grievance on the first occasion—it believed LIU's November 1997 action violated the CBA—and on the second occasion, it did not, because the Union did not believe that LIU's August 17, 1998 termination notice violated the CBA. Union President Dr. Allen fully explained to Dr. Commodari the reasons for the Union's denial during a face-to-face meeting with him on August, 17, 1998, and in a letter sent to him on February 23, 1999. (Pl.'s Mem. Opp. I, Ex. A, ¶ 29; *id.*, Ex. Q.) In these communications, Dr. Allen reviewed the relevant provisions of the CBA for Dr. Commodari and explained that the Union believed the August 17, 1998 notice and the review that proceeded it comported with the relevant terms of the CBA. (*Id.*) Thus, the Union's duty of fair representation was fulfilled as long as its decision was based on a "informed, reasoned" interpretation of the CBA. *Spellacy*, 156 F.3d at 127. For the reasons stated above, *supra* § 2(b), in this case the Union did even better than that: its decision was based on what is, in this court's

view, the correct interpretation of the CBA on this issue. Accordingly, plaintiff has set forth no facts on the basis of which a reasonable jury could find that the Union "arbitrarily ignore[d]" his grievance or dismissed it in "perfunctory fashion." *Spellacy,* 156 F.3d at 128. The Union's motion for summary judgment on Dr. Commodari's fair representation claim is, therefore, granted.

### d. Summary

Dr. Commodari was understandably surprised and upset when he found another termination notice in his mailbox just six weeks after what he believed to be a victory before the arbitrator. However, the arbitrator's award only required LIU to appoint Dr. Commodari to a third year of employment. Despite Dr. Commodari's arguments to the contrary, the CBA and the arbitrator's award cannot be read as giving Dr. Commodari a fourth year of employment as well. Nothing in the CBA or the arbitrator's award precluded LIU from notifying Dr. Commodari that he would not be given a fourth year, provided that (1) LIU evaluated Dr. Commodari in accordance with the procedures required by the CBA before doing so, and (2) LIU gave him notice of termination before September 1st of his third year. For all the reasons set forth above, LIU complied with both requirements in terminating Dr. Commodari on August 17, 1998. Therefore, Dr. Commodari's § 301 claim against LIU and his related fair representation claim against the Union must be dismissed. Accordingly, both LIU and the Union's motions for summary judgment on plaintiff's § 301/fair representation claims are granted.

### (3)

### The Employment Discrimination Claims

By leave of court, Dr. Commodari amended his complaint to plead national origin discrimination and retaliation claims against LIU and the Union, including violations of § 1983, § 1981, Title VI, and Title VII. Each claim is considered below with respect to each defendant.

### a. LIU's Motion to Dismiss

### i. Section 1983

 Dr. Commodari claims that LIU's actions deprived him of his constitutional rights to due process and equal protection in violation of 42 U.S.C. § 1983 (1994). (Am.Compl.¶ 5.1.) Section 1983 provides legal and equitable remedies against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects ... any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983 (1994). To state a claim for relief under § 1983, plaintiff must establish that he was deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was due to some action by the state. *See American Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50, 119 S.Ct. 977, 985, 143 L.Ed.2d 130 (1999); *Madon v. Long Island Univ.,* 518 F.Supp. 246, 248 (E.D.N.Y.1981) (same). "Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Sullivan,* 526 U.S. at 50, 119 S.Ct. at 985 (internal quotations and citations omitted).

Dr. Commodari has not alleged that LIU is a state actor. In fact, in his original Complaint, which is incorporated by reference into his Amended Complaint, Dr. Commodari acknowledges that LIU is a *private* institution of higher learning. (Am. Compl. ¶ 1; Compl. ¶ 4.) This admission is, however, not dispositive of Dr. Commodari's constitutional claims, for in certain circumstances a private actor such as LIU may be deemed a state actor for the purposes of a § 1983 action.

Generally, there are at least three different situations in which seemingly private action may be deemed state action for the purposes of § 1983:(1) when the private actor performs a traditional state function, *see Marsh v. Alabama*, 326 U.S. 501, 506–07, 66 S.Ct. 276, 278–79, 90 L.Ed. 265 (1946); (2) when a symbiotic relationship or close nexus exists between the private actor and the state, *see Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 723–25, 81 S.Ct. 856, 861–62, 6 L.Ed.2d 45 (1961) (symbiotic relationship); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974) (close nexus); and (3) when the private actor is a "willful participant in joint activity with the State or its agents," *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941, 102 S.Ct. 2744, 2756, 73 L.Ed.2d 482 (1982). In regard to the third doctrine, "mere allegations of State financial or other support, without more, are insufficient to convert an otherwise independent entity into a 'joint venturer' with the State." *Madon*, 518 F.Supp. at 249 (citing *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 177, 92 S.Ct. 1965, 1973, 32 L.Ed.2d 627 (1972); *Wahba v. New York Univ.*, 492 F.2d 96, 100 (2d Cir.1974) (Friendly, J.); *Grafton v. Brooklyn Law School*, 478 F.2d 1137 (2d Cir.1973)).

*Madon, supra,* is instructive on plaintiff's § 1983 claim. In *Madon,* a former professor brought suit against LIU on the ground that he was denied procedural due process in the proceedings which led to his termination. Like Dr. Commodari, Madon did not allege that LIU was an agent of the state or one of its subdivisions. *See*

*Madon,* 518 F.Supp. at 249. Instead, Madon merely alleged that LIU had received financial assistance from the state. *See id.* Madon's complaint was, however,

> devoid of any allegation purporting to link this financial support to the particular actions of which plaintiff complains. A mere allegation of some funding, without assertions of pervasive regulation at all levels, *cf. Holodnak v. Avco Corp.,* 514 F.2d 285 (2d Cir.1975), and without even a suggestion of how the funding may have caused or contributed to the alleged deprivation, *see Powe v. Miles,* [407 F.2d 73 (2d Cir.1968) ], is insufficient to plead the requisite State action. *See Wahba v. New York University, supra,* 492 F.2d at 98–100; *Kaplan v. Long Island University,* 85 CCH Lab. Cas. ¶ 10,942, at 19,650 (S.D.N.Y.1978) (State financial aid to LIU for dormitory construction and general education purposes insufficient to establish State action); *Miller v. Long Island University,* 85 Misc.2d 393, 380 N.Y.S.2d 917 (Sup. Ct. Kings County 1976) (LIU not State actor, under federal case law, with regard to claim of denial of procedural due process).

*Id.* Finding no state action, the court dismissed the complaint against LIU. *See id.* at 250.[9]

Similarly, nowhere in Dr. Commodari's Amended Complaint or in his many submissions to this court has Dr. Commodari ever alleged facts that would support a recognized theory of "state action" against LIU. Accordingly, plaintiff's § 1983 claim against LIU is dismissed.[10]

---

**9.** *Scelsa v. City Univ. of New York,* 806 F.Supp. 1126 (S.D.N.Y.1992), which is cited by plaintiff throughout his papers, is not to the contrary. In *Scelsa,* the court permitted a § 1983 suit for prospective injunctive relief against CUNY officials because CUNY was (and *is*) a state university and, hence, "an arm of the State of New York." *Id.* at 1137–38.

**10.** Nor do Dr. Commodari's allegations support a *Bivens* action against LIU. *See generally Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 397,

91 S.Ct. 1999, 2005, 29 L.Ed.2d 619 (1971) (permitting individuals to recover damages from federal actors who have deprived them of constitutional rights); *Davis v. Passman,* 442 U.S. 228, 235, 99 S.Ct. 2264, 2271, 60 L.Ed.2d 846 (1979) (holding that equal protection component of the Fifth Amendment's Due Process Clause gives rise to *Bivens* employment discrimination action). As an initial matter, it should be noted that the courts are split on whether a *Bivens* action can ever be maintained against a private corporation

### ii. Section 1981

#### A. Discriminatory Discharge

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981(a) (1994). In 1991, Congress amended the statute to clarify that § 1981 prohibits employment discrimination on the basis of race. *See* Civil Rights Act of 1991, Pub.L. 102–166, 105 Stat. 1071, Title I, § 101 (codified at 42 U.S.C. § 1981(b) (1994) ("For the purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.")) (abrogating *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989)).

▮▮▮▮ Unlike claims arising under § 1983, § 1981 applies to purely private actors who intentionally discriminate on

the basis of "race." *See Runyon v. McCrary*, 427 U.S. 160, 168–75, 96 S.Ct. 2586, 2593–97, 49 L.Ed.2d 415 (1976); *Albert v. Carovano*, 851 F.2d 561, 571 (2d Cir.1988). Defendants correctly note that § 1981 does not apply to discrimination on the basis of national origin. *See Saint Francis College v. Al–Khazraji*, 481 U.S. 604, 613, 107 S.Ct. 2022, 2028, 95 L.Ed.2d 582 (1987); *Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir.1998). However, in accordance with the understanding of the statute's drafters, "race" for the purposes of § 1981 includes ethnicity. *See Al–Khazraji*, 481 U.S. at 609–13, 107 S.Ct. at 2026–28 (noting that in the post-Civil War period numerous ethnic groups were considered to constitute separate "races," including Swedes, Norwegians, Germans, Greeks, Finns, *Italians,* Spaniards, Russians, and Hungarians); *Albert,* 851 F.2d at 572. In particular, § 1981 applies to discrimination on the basis of Italian ancestry. *See Al–Khazraji,* 481 U.S. at 611, 107 S.Ct. at 2027; *Bisciglia v. Kenosha Unified Sch. Dist. No. 1,* 45 F.3d 223, 229–30 (7th Cir.

(as opposed to individual employees of a private corporation). *Compare Hammons v. Norfolk Southern Corp.,* 156 F.3d 701, 708 (6th Cir.1998) (holding that *Bivens* action may be maintained against private corporation that acts under color of federal law); *Dobyns v. E–Systems, Inc.,* 667 F.2d 1219 (5th Cir.1982) (assuming same without discussion), *with Kauffman v. Anglo–American School of Sofia,* 28 F.3d 1223, 1226–28 (D.C.Cir.1994) (holding that, like federal agencies, unincorporated associations may not be sued under *Bivens* ); *Shannon v. General Elec. Co.,* 812 F.Supp. 308, 323 (N.D.N.Y. 1993) (holding that *Bivens* does not apply to private companies).

However, even if this court were to recognize a *Bivens* action against a private corporation, corporate liability would, of course, have to be predicated on a finding that the corporation had acted under color of federal law. *See Bivens,* 403 U.S. at 389, 91 S.Ct. at 2001; *Tavarez v. Reno,* 54 F.3d 109, 110 (2d Cir.1995). For the purposes of determining whether a private party acts under color of federal law, courts apply the same principles as in they do in determining whether a private party acts under color of state law in a § 1983 action. *See Polanco v. U.S. Drug Enforcement Admin.,* 158 F.3d 647, 653 (2d Cir. 1998) (noting that *Bivens* and § 1983 actions

" 'are not significantly dissimilar ... in terms of [i] the interests being protected, [ii] the relief which may be granted, and [iii] the defenses which may be asserted' " (quoting *Chin v. Bowen,* 833 F.2d 21, 23 (2d Cir. 1987))); *Tavarez,* 54 F.3d at 110 (noting that "federal courts have typically incorporated § 1983 law into *Bivens* actions").

Here, the only allegation of federal involvement with LIU in any of Dr. Commodari's various pleadings and submissions is an assertion that LIU has received federal funding. *See* Letter from Linda A. Jelicks, Ph.D. of 1/26/00 (describing $310,000 grant obtained by Dr. Commodari to establish bridge program for minority masters of science students at LIU) [hereinafter Jelicks Letter], attached as exhibit to Pl.'s Mem. Opp. Defs.' Mots. Summ. J./Dismiss Pl.'s Am. Compl. [hereinafter Pl.'s Mem. Opp. II]. The principles announced by Judge Friendly in *Wahba* render this allegation insufficient to state a claim under *Bivens* against LIU. *See Wahba,* 492 F.2d at 102–03 (holding that allegation of federal funding would not by itself transform private university's adverse employment action into federal action for purposes of *Bivens* action).

1995); *Benigni v. City of Hemet*, 879 F.2d 473, 477 (9th Cir.1988); *Scelsa*, 806 F.Supp. at 1145 & n. 16; *DeSalle v. Key Bank of S. Maine*, 685 F.Supp. 282, 284 (D.Me.1988). Accordingly, Dr. Commodari's pro se Amended Complaint will be interpreted as pleading a "race" discrimination claim in this extended sense.

■■■■ To state a prima facie case of discriminatory discharge under § 1981, plaintiff must allege that: (1) he belongs to a protected group; (2) he was qualified for the position; (3) he was discharged; and (4) the discharge took place under circumstances giving rise to an inference of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (establishing requirements for prima facie case of discriminatory discharge under Title VII); *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir.1997) (holding that requirements for prima facie case of discriminatory discharge under § 1981 are the same as under Title VII); *Choudhury v. Polytechnic Inst. of New York*, 735 F.2d 38, 44 (2d Cir.1984) (same). A plaintiff may satisfy the fourth element of the prima facie case by showing, inter alia, (1) that similarly situated employees who were not members of the same protected group as the plaintiff were treated more favorably than the plaintiff, *see Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89 (2d Cir.1999); *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir.1997); or (2) that plaintiff was replaced by someone outside his protected group, *see Kerzer v. Kingly Mfrg.*, 156 F.3d 396, 401 (2d Cir.1998); *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir.1995). Thus, the requirements for establishing a prima face case are "minimal." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir.1997) (en banc).

■■■ Dr. Commodari has alleged facts sufficient to satisfy each of the elements of a prima case of discharge on the basis of race. First, Dr. Commodari has alleged that he belongs to a group protected by § 1981: he alleges that he is an individual of Italian ethnicity. (Am.Compl.¶ 2.) Second, plaintiff has alleged that he was qualified for position, stating that he always performed his work in an above satisfactory manner and that there were never any complaints concerning the quality of his work. (*Id.* ¶ 3.) Third, plaintiff has alleged that he was discharged. (*Id.*) Finally, plaintiff has alleged facts that give rise to an inference of discrimination. Specifically, Dr. Commodari claims that two non-Italian assistant chemistry professors with far fewer publications than Dr. Commodari (viz., Drs. Samuel Watson and Edward J. Donahue) were granted reappointment, while he was fired. (*Id.* ¶ 5.1.) In addition, Dr. Commodari alleges that the individual hired to replace him, Dr. Gregory Edens, is not Italian. (Pl.'s Mem. Opp. II, at 19.) Thus, Dr. Commodari's Amended Complaint easily satisfies the "minimal" pleading requirements of § 1981. Accordingly, LIU's motion to dismiss plaintiff's § 1981 discriminatory discharge claim is denied.

■■■■ It should be noted that § 1981 has no administrative filing requirements, *see Patterson*, 491 U.S. at 181, 109 S.Ct. at 2375; *Holt v. Continental Group, Inc.*, 708 F.2d 87, 89–90 (2d Cir.1983), and carries a statute of limitations of three years in New York, *see Wilson v. Fairchild Republic Co.*, 143 F.3d 733, 738 n. 5 (2d Cir.1998); *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir.1993). Because Dr. Commodari's Amended Complaint was filed on November 12, 1999, his § 1981 claim, therefore, properly extends to: (1) the November 1997 termination (to the extent that a claim based thereupon is not rendered moot by the fact that Dr. Commodari received a third year of employment pursuant to the arbitral award), (2) the August 1998 termination, (3) the November 1998 decision not to rescind his notice of termination (to the extent that this decision was an independently dis-

criminatory act and not merely a confirmation of the August 1998 decision), and (4) all reasonably related acts during the period beginning on the date three years prior to the filing of the Amended Complaint, viz., November 12, 1996, and ending on the date his termination became effective, August 31, 1999.

## B. Retaliation

■ Dr. Commodari has also brought a retaliation claim against LIU based on his opposition to certain alleged racially discriminatory hiring practices, viz., the hiring of a non-Hispanic chemistry professor, Dr. Podensin, in lieu of better qualified Hispanic candidates. (Am.Compl.¶ 5.7.) Dr. Commodari has styled his claim as one arising under Title VI and Title VII, (id.), but for reasons discussed below, he does not have standing to assert a Title VI claim against LIU, see infra § 2(a)(iii), and his retaliation claim under Title VII is, in all likelihood, barred by its 300-day administrative filing period, see infra § 2(a)(iv)(A)(1), (B). However, when dealing with a pro se complaint, it is improper to dismiss for failure to state a claim where the plaintiff has simply failed to identify or name the appropriate statute; rather, to survive a motion to dismiss pursuant to Rule 12(b)(6), it is sufficient that the pro se plaintiff allege facts upon which a recognized legal claim could be based. See Crossman v. Crosson, 101 F.3d 684, 1996 WL 280096 (2d Cir.1996) (Table) (citing Frasier v. General Elec. Co., 930 F.2d 1004, 1008 (2d Cir.1991); Bobal v. Rensselaer Polytechnic Inst., 916 F.2d 759, 763 (2d Cir.1990); Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir.1991)).

■ The Second Circuit has recognized that retaliation for opposition to discriminatory hiring practices is actionable under § 1981. See Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684, 693 (2d Cir.1998) (finding that legislative history of the Civil Rights Act of 1991 confirms that § 1981 comprehends retaliation claims); Albert, 851 F.2d at 572 (§ 1981 protects individu-

als who are " 'punished for trying to vindicate the rights of minorities protected by [the statute]' " (quoting Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 237, 90 S.Ct. 400, 404, 24 L.Ed.2d 386 (1969))); see also Choudhury, 735 F.2d at 44 (§ 1981 supports claim by employee who alleged that he was retaliated against for filing claim with the EEOC). Dr. Commodari's retaliation claim will, therefore, be analyzed under § 1981.

■ To make out a prima facie case of retaliation under § 1981, an employee must show that: (1) he was engaged in a protected activity known to the defendant; (2) he suffered an adverse employment decision; and (3) there was a causal connection between the protected activity and the adverse employment decision. See Taitt v. Chemical Bank, 849 F.2d 775, 777 (2d Cir.1988); DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 115 (2d Cir.1987).

> Proof of causal connection can be established indirectly by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant.

DeCintio, 821 F.2d at 115 (citations omitted).

According to Dr. Commodari, Dr. Donald Rogers, a tenured member of the Chemistry Department, "threatened to make sure that none of the junior faculty would succeed at [Appointment, Reappointment, Promotion and Tenure], if his candidate, Dr. Podensin, was not hired." (Am.Compl.¶ 5.7.) Dr. Podensin was subsequently hired, but later terminated. (Id.) Dr. Commodari alleges that "[t]here were candidates for the job who had better credentials, who were native Hispanic-American, yet Dr. Podensin was hired, and Dr. Commodari's troubles began the following November, 1997, with his first ter-

mination notice." (*Id.*) As evidence of retaliation, Dr. Commodari averts to a May 4, 1998 letter from Dr. Rogers to the Chemistry Department's then-Chairman Dr. Hirschberg, criticizing Dr. Commodari and another associate chemistry professor, Dr. Aderemi Oki, for failing to properly maintain the chemistry laboratory. (*Id.*)

■ In light of the reduced level of scrutiny that is appropriate for evaluating pro se complaints, *see Haines*, 404 U.S. at 520, 92 S.Ct. at 596; *Boddie*, 105 F.3d at 861, Dr. Commodari's allegations of retaliation state a prima facie case as outlined in *Taitt*, but just barely. First, although Dr. Commodari does not allege any protected activity in his Amended Complaint itself, he does allege in his Memorandum in Opposition that he "was on record (June 17, 1997 meeting) as opposing Podensin's hiring, as other candidates, including Hispanic Americans (eg. [sic] Dr. Andrew Pineda, a Harvard graduate with more experience) were more qualified." (Pl.'s Mem. Opp. II, at 17.) To the extent that the substance of Dr. Commodari's June 1997 objection was a concern that qualified Hispanic–American candidates were being passed over on the basis of their race, as opposed to a concern that the department was making choices on the basis of personal favoritism, Dr. Commodari's objection could be a protected activity within the meaning of § 1981. Second, his November 1997 termination clearly constituted an adverse employment decision. Finally, the fact that he was terminated during the first review cycle following the June 1997 meeting could be evidence of a causal connection between his speaking out and his termination.

Of course, Dr. Commodari's pleadings raise two serious, and perhaps fatal, questions for his retaliation claim: (1) Was the objection that Dr. Commodari voiced at the June 17, 1997 meeting in fact an objection to racial discrimination or merely an objection to hiring on the basis of personal favoritism?, and (2) Did any of the individuals present at or who knew about Dr.

Commodari's objection at the June 1997 meeting take part in the initial, November 1997 decision to terminate his employment? Disposition of these questions, however, is only appropriate for summary judgment or trial, for it cannot be said strictly on the basis of the pleadings to date that it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45–46, 78 S.Ct. at 102. Bearing in mind that the "latter principle is to be applied with particular strictness when the plaintiff complains of a civil rights violation," *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir.1991), LIU's motion to dismiss Dr. Commodari's § 1981 retaliation claim is denied.

■ Plaintiff is reminded, however, that conclusory allegations are not sufficient to defeat a motion for summary judgment. *See* Fed.R.Civ.P. 56(e); *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). Thus, plaintiff must come forward with (1) evidence supporting his claim that his June 1997 objection was an activity protected by § 1981, and (2) additional evidence of the type described in *DeCintio* that supports the alleged causal connection to his termination. It will not be sufficient for plaintiff to rest on allegations that Dr. Rogers was angered by what he perceived to be Dr. Commodari's interference with the employment of someone to whom Dr. Rogers showed personal favoritism and that Dr. Rogers took some retaliatory step, such as writing the May 1998 letter, *after* the decision to terminate Dr. Commodari had already been made.

### iii. Title VI

■ Title VI of the Civil Rights Act of 1964 provides:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program

or activity receiving Federal financial assistance.

42 U.S.C. § 2000d (1994). In order to have standing to bring a claim against LIU for violation of Title VI, plaintiff must allege that: (1) LIU received federal financial assistance, (2) he was an intended beneficiary of the program or activity receiving the assistance, and (3) LIU discriminated against him on the basis of race, color, or national origin in connection with that program or activity.[11] In short, plaintiff must allege a "logical nexus" between a federally funded program or activity and the employment discrimination he allegedly suffered. *AADE*, 647 F.2d at 276.

 The allegations of Dr. Commodari's Amended Complaint and his other submissions to this court do not establish any logical nexus between his termination and a federal funded LIU program or activity. Indeed, Dr. Commodari makes

only two references to federal funding in his papers.

First, Dr. Commodari states that he was responsible for bringing a $310,000 National Institute of Health ("NIH")[12] grant to LIU to establish its "Bridges to the Doctoral Degree" program, a supplemental education program designed to prepare minority students in LIU's Masters Program for doctoral studies. (Jelicks Letter, *supra* note 10.) As described in Dr. Jelicks's letter, the intended beneficiaries of the program were the participating students, not the professors, such as Dr. Commodari, who administered the program. Put another way, the program was not "aimed primarily at providing employment." *AADE*, 647 F.2d at 276.

Second, Dr. Commodari has submitted a hard copy of his web page. Included on the web page is a list of grants, in which Dr. Commodari states: "I wrote a supple-

---

**11.** *See David K. v. Lane*, 839 F.2d 1265, 1275 (7th Cir.1988) (where an institution has different programs only those specific programs that receive federal funding are subject to Title VI); *B. Doe, M.D. v. St. Joseph's Hosp. of Fort Wayne*, 788 F.2d 411, 419 (7th Cir.1986) ("[T]o bring a private action under Title VI the plaintiff must be the intended beneficiary of, an applicant for, or a participant in a federally funded program." (citations, internal quotations, and footnote omitted)), *overruled on other grounds, Alexander v. Rush North Shore Med. Ctr.*, 101 F.3d 487 (7th Cir.1996); *Association Against Discrimination in Employment, Inc. v. City of Bridgeport*, 647 F.2d 256, 276 (2d Cir.1981) ("*AADE*") ("[F]or a claimant to recover under Title VI against an employer for discriminatory employment practices, a threshold requirement is that the employer be the recipient of federal funds aimed primarily at providing employment." (citations omitted)); *id.* at 276–77 (complaint properly dismissed where it "contained no express allegation as to the primary purpose of [the federal funding]"); *Belgrave v. City of New York*, No. 95–CV–1507 (JG), 1999 WL 692034, at *37 (E.D.N.Y. Aug. 31, 1999) (same); *Murphy v. Middletown Enlarged Sch. Dist.*, 525 F.Supp. 678, 708 (S.D.N.Y.1981) (plaintiff bringing employment discrimination claim under Title VI must show that the primary objective of the federal program is to provide employment and that employment discrimination necessarily causes discrimination against the primary beneficiaries of the

federal program); *see also Soberal–Perez v. Heckler*, 717 F.2d 36, 38 (2d Cir.1983) (holding that Title VI covers only those cases where "federal funding is given to a nonfederal entity which, in turn, provides financial assistance to the ultimate beneficiary"); *Tripp v. Long Island Univ.*, 48 F.Supp.2d 220, 226 (E.D.N.Y.) (same), *aff'd*, 201 F.3d 432, 1999 WL 1059844 (2d Cir.1999) (Table); *Scelsa*, 806 F.Supp. at 1140 ("In order to establish standing to sue under [Title VI] plaintiffs must be the intended beneficiaries of the federal spending program."); *cf.* 42 U.S.C. § 2000d–3 (1994) (prohibiting government agencies and departments from commencing action "with respect to any employment practice of any employer ... except where a primary objective of the Federal financial assistance is to provide employment"); *Grove City College v. Bell*, 465 U.S. 555, 571, 104 S.Ct. 1211, 1220, 79 L.Ed.2d 516 (1984) (although federal student aid constituted federal funding under Title IX, that fact did not make the entire college subject to Title IX, but only the college's student financial aid program).

**12.** "NIH is one of eight health agencies of the Public Health Service which, in turn, is part of the U.S. Department of Health and Human Services." National Institute of Health, *HIH Overview* (visited March 28, 2000) <http://www.nih.gov/about/nihnew.html>.

ment to [LIU's National Science Foundation [13]] grant application (1996) for funding for a high resolution NMR [nuclear magnetic resonance] instrument which resulted in the procurement of $60 000.00 in additional funding." (Letter from Dr. Commodari to Chambers of 2/5/00, Ex. 3, Hard Copy of <http://members.aol.com:/fcommodari/FCWEB/FC.htm>.) The aim of the NSF grant, as described by Dr. Commodari, was to provide LIU with a piece of laboratory equipment, not to provide employment.

Dr. Commodari's allegations are thus insufficient to give him standing to sue under Title VI. Plaintiff's Title VI claim against LIU is, therefore, dismissed.

### iv. Title VII
#### A. Discriminatory Discharge

LIU has raised three principal arguments in support of its motion to dismiss Dr. Commodari's Title VII discriminatory discharge claim: (1) plaintiff did not file a charge with the EEOC charge within 300 days of the alleged discriminatory employment action(s); (2) plaintiff's right-to-sue letter is invalid since the EEOC issued it fewer than 180 days after plaintiff filed his EEOC charge; and (3) plaintiff fails to state a prima facie case of discrimination under Title VII. Each argument will be considered in turn below.

#### 1. Timeliness of the EEOC Charge

■ Because the existence of its State Division of Human Rights makes New York a so-called "deferral state" for Title VII purposes, an aggrieved employee has 300 days from time when he or she knew or should have known of an adverse employment decision to file a charge of dis-

crimination with the EEOC. *See* 42 U.S.C. § 2000e–5(e)(1) (1994); *Harris v. City of New York,* 186 F.3d 243, 247 & n. 2. (2d Cir.1999). Since Dr. Commodari filed his EEOC charge against LIU on September 22, 1999, his Title VII action is, therefore, limited to adverse employment decisions that he knew or should have known of within 300 days before that date, i.e., decisions of which he had actual or constructive notice on or after November 26, 1998. *See Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 765 (2d Cir.1998) (citing *Butts v. City of New York Dep't of Housing Preservation & Dev.,* 990 F.2d 1397, 1401 (2d Cir.1993)).

■ As a result, the only LIU employment decision upon which Dr. Commodari's can even potentially be granted relief under Title VII is the November 24, 1998 decision not to rescind his notice of termination. Although the letter notifying Dr. Commodari of the non-rescind decision is dated November 24, 1998, (Pl.'s Mem. Opp. I, Ex. K), the envelope in which the notice was mailed is post-marked November 25, 1998, (Envelope attached as exhibit to Pl.'s Mem. Opp. II.). Judicial notice is taken of the fact that a letter delivered to the post office on a given day will not be delivered, and hence not received, until the subsequent day at the earliest.[14] Accordingly, the earliest date that Dr. Commodari could have been aware of the contents of the letter was November 26, 1998. Further judicial notice is taken of the fact that November 26, 1998 was Thanksgiving, a postal holiday, thus pushing the earliest receipt date to November 27, 1998. Therefore, Dr. Commodari could not have had actual or constructive notice of LIU's

---

13. The NSF is an independent federal agency established by the National Science Foundation Act of 1950, 42 U.S.C. §§ 1861–1887 (1994 & Supp.1999). The NSF promotes science and engineering through grants to research and education projects in those fields. *See* NSF, *About the NSF: Creation and Mission* (visited March 29, 1999) <http://www.nsf.gov/home/about/creation.htm>.

14. "Normally it is assumed that a mailed document is received three days after its mailing." *Sherlock v. Montefiore Med. Ctr.,* 84 F.3d 522, 525 (2d Cir.1996) (Title VII/ADEA action) (citing *Baldwin County Welcome Ctr. v. Brown,* 466 U.S. 147, 148 n. 1, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984)).

decision not to rescind until November 27, 1998 at the earliest, bringing a Title VII claim based on that notice just within the 300–day limitation period.

■ However, this finding does not necessarily render a claim based on the November 1998 notice timely. As LIU points out, the Supreme Court held in *Delaware v. Ricks*, 449 U.S. 250, 257–58, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980), that Title VII relief is generally not available with respect to a decision, which is made during the limitations period, not to rescind a discriminatory decision that took place outside the limitation period.

In *Ricks*, a college board of trustees voted to deny tenure to a Liberian professor. On June 26, 1974, the college notified him of its decision and offered him a one-year terminal contract that would expire on June 30, 1975. Ricks filed an action under Title VII and § 1981 against the college on September 9, 1977, alleging national origin discrimination. Under the applicable Delaware statute of limitations, Ricks was required to bring the § 1981 suit within three years after he learned of the adverse employment decision. Although Ricks received the June 26, 1974 notice more than three years before filing his action, he argued that the timeliness of his action should be measured as of June 30, 1975. Ricks asserted that it was possible for the college to rescind his notice of termination at any time through June 30, 1975, and that the college's failure to do so on June 30, 1975 constituted a fresh act of discrimination upon which he was entitled to § 1981 relief.

■ The Supreme Court firmly rejected Ricks's argument:

Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination. If Ricks intended to complain of a discriminatory discharge, he should have identified the alleged discriminatory acts that continued until, or

occurred at the time of, the actual termination of his employment. . . .

. . . It appears that termination of employment at [the college] [was] a delayed, but inevitable consequence of the denial of tenure. In order for the limitations period to commence with the date of discharge, Ricks would have had to allege and prove that the manner in which his employment was terminated differed discriminatorily from the manner in which the College terminated other professors who also had been denied tenure. . . .

. . . It is simply insufficient for Ricks to allege that his termination "gives present effect to the past illegal act and therefore perpetuates the consequences of forbidden discrimination."

*Ricks*, 449 U.S. at 257–58, 101 S.Ct. at 504 (citations omitted).

■ The same principles apply to Dr. Commodari's Title VII claim. *See Chase v. New York City Bd. of Educ.*, 1998 WL 907933, at \*1, 166 F.3d 1199 (2d Cir. 1998) (Table) (applying *Ricks* to Title VII claim). To the extent that the November 1998 decision not to rescind was just a "delayed, but inevitable consequence," *Ricks*, 449 U.S. at 257–58, 101 S.Ct. at 504, of the time-barred August 1998 decision to terminate his employment, Dr. Commodari's claim is untimely. To maintain a Title VII action on the November 1998 non-rescind decision, Dr. Commodari must produce evidence that the manner in which his non-rescind decision was made "differed discriminatorily from the manner in which [LIU]" made non-rescind decisions with respect to non-Italian professors who had also been given prior notices of termination. *Id.* at 257–58, 101 S.Ct. at 504.

Dr. Commodari has alleged throughout his papers that the November 1998 non-rescind decision was based on an improperly conducted third-year review in the fall of 1998. (*E.g.*, Letter from Dr. Commodari to Chambers of 11/26/99, at 2 (alleging that his "third year evaluation was a farce"); Letter from Dr. Commodari to

Chambers of 11/20/99, at 3 (alleging that Dr. Michael Arons, LIU's vice president for academic affairs, *"repeatedly* interfered with the [reappointment evaluation] process with regards to the plaintiff").) To the extent that Dr. Commodari can produce evidence substantiating his claim that the third-year review that precipitated the November 1998 non-rescind decision was itself conducted in a discriminatory manner, he may be able to establish that the November 1998 decision was an independent act of discrimination and, thus, a basis for a timely Title VII action. Consequently, plaintiff's allegations of improprieties surrounding his third-year review, though conclusory, suffice to state a timely Title VII claim with respect to the November 1998 non-rescind decision.

With respect to his Title VII claim, plaintiff is, therefore, entitled to conduct discovery on the limited issue of the propriety of the November 1998 non-rescind decision. In this regard, it should be noted that none of the recognized exceptions to Title VII's 300-day limitations period— waiver, estoppel, equitable tolling, and the continuing violation doctrine—are available to save plaintiff's Title VII claim as it relates to the November 1997 and August 1998 terminations (or the November 1998 non-rescind decision, for that matter, if no evidence that it was an independently discriminatory act is forthcoming).

 First, LIU raised the limitations issue in its timely pre-answer motion to dismiss the amended complaint and, therefore, has not waived the defense. *See* Fed.R.Civ.P. 12(b), (h)(2). Second, LIU is not estopped from asserting the limitations defense since plaintiff has not alleged that LIU "misrepresented the length of the limitations period or in some way lulled the plaintiff into believing that it was not necessary for him to commence litigation." *Cerbone v. International Ladies' Garment Workers' Union,* 768 F.2d 45, 50 (2d Cir. 1985). Third, plaintiff has not alleged any of the various circumstances that might equitably toll the 300-day filing period.[15]

 Finally, plaintiff is not entitled to the benefit of the continuing violation doctrine. This tolling effect "applies only where discrimination is accomplished through a specific official policy or mechanism, which is not alleged here." *Butts,* 990 F.2d at 1404; *accord Quinn,* 159 F.3d at 765 (requiring showing of "ongoing policy of discrimination"). "[M]ultiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." *Lambert v. Genesee Hosp.,* 10 F.3d 46, 53 (2d Cir.1993). Moreover, where, as here, plaintiff failed to assert a continuing violation or an ongoing policy of discrimination in his EEOC charge, (EEOC Charge No. 160992869), he may not rely on the continuing violation exception in a subsequent district court action. *See Carrasco v. New York City Off–Track Betting Corp.,* 858 F.Supp. 28, 31 (S.D.N.Y.1994) (citing *Miller v. International Tel. & Tel. Corp.,* 755 F.2d 20, 25 (2d Cir.1985)), *aff'd,* 50 F.3d 3 (2d Cir. 1995).

Accordingly, LIU's motion to dismiss Dr. Commodari's Title VII claim as untimely is granted with respect to the November 1997 and August 1998 termination decisions, but denied with respect to the November 1998 non-rescind decision.

### 2. The early issuance of the right-to-sue letter does not bar plaintiff's suit.

 Title VII provides that the EEOC has 180 days after the filing of a charge of

---

15. Equitable tolling has been applied where (1) the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, (2) the complainant was induced or tricked by defendant's misconduct into allowing the filing deadline to pass, (3) the court has led the plaintiff to believe that he had done all that was required of him, (4) the claimant has received inadequate notice, or (5) where a motion for the appointment of counsel is pending. *See South v. Saab Cars USA, Inc.,* 28 F.3d 9, 11– 12 (2d Cir.1994) (collecting cases).

discrimination to dismiss an aggrieved party's charge, institute a civil action on his behalf, or negotiate a conciliation agreement between the aggrieved party and his employer; if the EEOC has not achieved any of those dispositions of the charge at the expiration of the 180–day period, the EEOC must issue the aggrieved party a right-to-sue letter allowing him to bring an action in federal district court. *See* 42 U.S.C. § 2000e–5(f)(1) (1994). In 1977, the EEOC promulgated 29 C.F.R. § 1601.28(a)(2) (1998), which authorizes EEOC officials to issue a right-to-sue letter prior to expiration of the 180–day period if "it is probable that the Commission will be unable to complete its administrative processing of the charge within [the period]."

Pursuant to the regulation, the EEOC issued Dr. Commodari a right-to-sue letter against LIU only six days after he filed his charge of discrimination. LIU argues that the EEOC's early issuance of the right-to-sue letter contravenes 42 U.S.C. § 2000e–5(f)(1), and that the subject letter, therefore, gives Dr. Commodari no right to bring a Title VII action in this court.

Currently, there is a split of opinion among the federal courts as to whether a court may entertain a Title VII action on the basis of a right-to-sue letter issued by the EEOC before the expiration of the 180–day administrative review period contemplated by the statute. *Compare Sims v. Trus Joist MacMillan,* 22 F.3d 1059, 1061–63 (11th Cir.1994) (holding that early issuance of right-to-sue letter does not bar Title VII suit); *Saulsbury v. Wismer and Becker, Inc.,* 644 F.2d 1251, 1257 (9th Cir. 1980) (same); *Palumbo v. Lufthansa German Airlines,* No. 98 Civ. 5005(HB), 1999 WL 540446, at *2 (S.D.N.Y. July 26, 1999) (Baer, J.) (same); *Figueira v. Black Entertainment Television,* 944 F.Supp. 299, 303–08 (S.D.N.Y.1996) (Mukasey, J.) (same), *with Martini v. Federal Nat'l Mortgage Ass'n,* 178 F.3d 1336, 1340–48 (D.C.Cir.1999) (holding that early right-to-sue letter is invalid); *Stetz v. Reeher En-*

*ters., Inc.,* 70 F.Supp.2d 119, 120–25 (N.D.N.Y.1999) (Smith, J.) (same); *Rodriguez v. Connection Tech., Inc.,* 65 F.Supp.2d 107, 110 (E.D.N.Y.1999) (Spatt, J.) (same); *Henschke v. New York Hosp.-Cornell Med. Ctr.,* 821 F.Supp. 166, 169–71 (S.D.N.Y.1993) (Preska, J.) (same); *True v. New York State Dep't of Correctional Serv.,* 613 F.Supp. 27, 29–30 (W.D.N.Y. 1984) (Elfvin, J.) (same).

Courts that have held early right-to-sue letters invalid have reasoned that Congress contemplated that investigation and conciliation efforts on the part of the EEOC would be an integral part of the Title VII remedy, and that the EEOC is, therefore, required to make some effort at investigating a charge and conducting some conciliation between employer and employee during the 180–day period after the filing of a charge of discrimination. *See, e.g., Martini,* 178 F.3d at 1346–47. Consequently, these courts have held that the EEOC may not issue a right-to-sue letter until the expiration of the 180–day period, and that any letter issued before the expiration of that period is invalid. *See, e.g., id.* at 1347.

■ Until the Supreme Court or the Second Circuit provides guidance to the contrary, I reject this reading of Title VII. The notion that invalidating early right-to-sue letters will spur the EEOC to action ignores the realities of the EEOC's caseload and the level to which it has been funded in recent years. Congress has simply not funded the EEOC at a level necessary for it to pursue conciliation efforts on the extraordinary and ever-growing number of charges filed with it. The EEOC cannot be cajoled into doing what it does not have the capacity to do. Thus, the result of such decisions will not be that the EEOC begins to play a more active role in addressing employment discrimination through administrative conciliation efforts. Instead, unless the agency's budget is significantly increased, in jurisdictions adhering to the *Martini* court's approach, the EEOC will simply adopt a practice of hold-

ing charges for the requisite 180 days, taking no action during that time, and then issuing a right-to-sue letter at the expiration of the period. The practical result will only be to delay the commencement of litigation that is inevitable. I do not believe that Congress intended to impose such an unnecessary and fruitless delay on an aggrieved employee under Title VII. *See, e.g., Sims,* 22 F.3d at 1061 (noting the EEOC's "huge backlog" and concluding that "it is pointless for the aggrieved party to stand by and mark time until the 180-day period expires"). *But see Martini,* 178 F.3d at 1347—48 (citing statements by the bill's sponsors that arguably suggest otherwise).

 For the purposes of this motion, however, it is unnecessary to reach a decision whether the EEOC's practice of issuing right-to-sue letters before the expiration of the 180-day period contravenes the statute, for the invalidity of a right-to-sue letter does not necessarily deprive a district court of jurisdiction to hear a Title VII claim. It is well-established that the various filing requirements of Title VII are not jurisdictional in nature, but are requirements that, "like a statute of limitations, [are] subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 1133, 71 L.Ed.2d 234 (1982) (failure to file timely charge with EEOC is not jurisdictional bar); *see Pietras v. Board of Fire Comm'rs,* 180 F.3d 468, 474 (2d Cir. 1999) (failure to obtain right-to-sue letter is not jurisdictional bar); *Johnson v. Al Tech Specialties Steel Corp.,* 731 F.2d 143, 146 (2d Cir.1984) (failure to sue within 90 days of issuance of right-to-sue letter is not jurisdictional bar). Similar equitable considerations should be available to a Title VII plaintiff who has been issued an early right-to-sue letter. *See Sims,* 22 F.3d at 1061; *cf.* 42 U.S.C. §§ 2000e-5(f)(3) (1994) (provision of Title VII giving jurisdiction to the district courts) (omitting any reference to the 180-day period). If the EEOC will not, or cannot because of

insufficient staffing or funding, undertake the investigation and conciliation efforts contemplated by Congress, the aggrieved employee and his employer should not be forced to undergo needless delay in what will inevitably a judicial resolution of their dispute. Accordingly, I hold that the issuance of a right-to-sue letter by the EEOC prior to the expiration of the 180-day administrative review period does not operate as a jurisdictional bar to bringing a Title VII action in federal district court; rather, like a statute of limitations, it is a condition precedent to bringing suit that may be excused when doing so is warranted by relevant equitable considerations.

 In this case, the balance of equities supports excusing the 180-day waiting period. There has been no allegation that Dr. Commodari is responsible for the fact that the EEOC issued an early right-to-sue letter to him. Nor has LIU been prejudiced by the EEOC's failure to undertake conciliatory efforts: it is very clear from the background facts of this case and LIU's stance in these proceedings—e.g., its alleged settlement offer of one-year's salary during a break in the June 1998 arbitration, (Pl.'s Mem. Opp. I, Ex. A, ¶ 19), and its opposition to a preliminary injunction returning Dr. Commodari to his job—that LIU has no inclination to reinstate Dr. Commodari under any circumstances and would not be amenable to conciliation efforts by the EEOC. LIU's motion to dismiss Dr. Commodari's Title VII claim on the ground of the early right-to-sue letter is, therefore, denied.

### 3. Legal Sufficiency of Plaintiff's Claim

 LIU asserts that Dr. Commodari has not alleged facts sufficient to state a prima facie case of discrimination under Title VII. Specifically, LIU argues that various allegations in plaintiff's Amended Complaint, e.g., that the percentage of Italian professors on LIU's Brooklyn faculty is lower than the percentage of Italians in the general population of Brooklyn

or LIU's alleged failure to recruit from the Italian immigrant community, do not give rise to an inference of discrimination on the basis of national origin. (LIU's Mem. Supp. Mot. Dismiss. Am. Compl. at 9–11.)

In light of the points discussed earlier, *supra* § 3(a)(iv)(A)(1), LIU's argument misses the mark. Dr. Commodari has alleged that he was treated differently than any other assistant professor in the science division with respect to the third-year review that led to the November 1998 non-rescind decision. (*E.g.*, Pl.'s Mem. Opp. II, at 2.) Given that Dr. Commodari also alleges that he was the only Italian faculty member in the science division, (Am. Compl.¶¶ 3, 5.1), his allegation necessarily implies that he was treated differently from non-Italian faculty members in his third year review. Therefore, it does not appear "beyond doubt" that Dr. Commodari could prove no set of facts that would support his claim of disparate treatment on the basis of national origin with respect to the November 1998 non-rescind decision. *Conley*, 355 U.S. at 45–46, 78 S.Ct. at 102. LIU is, of course, entitled to test the sufficiency of any evidence Dr. Commodari is able to produce in support of this, the sole remaining aspect of his Title VII discrimination claim, on summary judgment,[16] but its motion to dismiss must be denied.

### B. Retaliation

■■■ Dr. Commodari also attempts to state a Title VII retaliation claim against LIU. As discussed previously, Dr. Commodari has "just barely" stated a viable § 1981 retaliation claim. *Supra* § 3(a)(ii)(B). Pertinently, the requirements for a prima facie case of retaliation are the same under § 1981 and Title VII. *Compare Taitt*, 849 F.2d at 777 (§ 1981),

with *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 443 (2d Cir.1999) (Title VII). Thus, leaving aside the problems engendered by Title VII's 300–day limitations period, Dr. Commodari also just barely states a claim for retaliation under Title VII.

However, because Dr. Commodari is not entitled to the benefit of the continuing violation doctrine, or waiver, estoppel, or equitable tolling with respect to his Title VII claim, *see supra* § 3(a)(iv)(A)(1), the only action by LIU upon which he may even potentially base his claim is the November 1998 non-rescind decision. As is the case with his Title VII discriminatory discharge claim, *see supra* § 3(a)(iv)(A)(3), the November 1998 decision will only support a viable Title VII retaliation claim if the November 1998 decision was an independent act of retaliation, rather than the confirmation of or acquiescence to a previous, time-barred retaliatory action, e.g., the November 1997 termination or the August 1998 termination. On summary judgment, plaintiff will, no doubt, face an uphill struggle to produce evidence showing the independently retaliatory nature of the November 1998 decision, if LIU so moves.[17] However, strictly on the basis of the pleadings, it does not "appear[ ] beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45–46, 78 S.Ct. at 102. Accordingly, LIU's motion to dismiss Dr. Commodari's Title VII retaliation claim is granted with respect to the November 1997 and August 1998 terminations, but denied with respect to the November 1998 non-rescind decision.

---

16. Given this court's earlier finding that it was not improper for the FRC to leave the recommendation field on his third year review form blank, *see supra* § 2(b), plaintiff should bear in mind that to defeat summary judgment on this issue he will have to produce some evidence of impropriety other than the blank recommendation field.

17. This is especially true considering that, in order to prove a prima facie case of retaliation with respect to the November 1998 decision, Dr. Commodari will have to establish a causal connection between that decision and the objection he voiced 17 months earlier at the June 17, 1997 department meeting. *See Taitt*, 849 F.2d at 777.

### b. The Union's Motion for Summary Judgment

#### i. Section 1983

As discussed previously, *supra* § 3(a)(i), claims under § 1983 can only be brought against state actors. Like LIU, the Union is a private, non-governmental entity. Accordingly, "[a]bsent some concert of action between a union and the state, a union's actions do not constitute state action." *Laboy v. Seabrook*, No. 96 Civ. 2359, 1996 WL 417523, at *2 (S.D.N.Y. July 25, 1996) (collecting cases). Nowhere in any of plaintiff's many submissions to the court has plaintiff alleged facts that would support a finding that the Union qualifies as a state actor under any recognized theory of state action. The Union's motion for summary judgment on Dr. Commodari's § 1983 claim is, therefore, granted.[18]

#### ii. Section 1981

Dr. Commodari's claim against the Union for ethnic discrimination consists exclusively of a general allegation that "[t]he union was party to the Long Island University administration's discriminatory and wrongful termination of the plaintiff on August 31, 1999." (Am. Compl. ¶ 4; *accord* Rubinstein Aff. of 11/29/99, Ex. 1, EEOC Charge No. 160992923.) Dr. Commodari has produced no direct evidence of discriminatory animus by the Union against Italians, e.g., anti-Italian statements by Union officials; no evidence of a pattern and practice of discrimination by the Union against Italian union members; nor any evidence of disparate treatment in his own case, e.g., evidence that the Union pursued a similar grievance on the part of a non-Italian un-

ion member. Because a motion for summary judgment cannot be defeated by the conclusory allegations of plaintiff's complaint, *see* Fed.R.Civ.P. 56(e); *Champion*, 76 F.3d at 486, the Union's motion for summary judgment on Dr. Commodari's § 1981 claim is granted.

#### iii. Title VI

As previously discussed, *supra* § 3(a)(iii), Title VI covers only those situations where "federal funding is given to a non-federal entity which, in turn, provides financial assistance to the ultimate beneficiary." *Soberal–Perez*, 717 F.2d at 38; *Tripp*, 48 F.Supp.2d at 226; *J. & L. Parking Corp. v. United States*, 834 F.Supp. 99, 104–105 (S.D.N.Y.1993), *aff'd*, 23 F.3d 397 (2d Cir.1994) (Table). Plaintiff has not alleged in his Amended Complaint or elsewhere that the Union is a recipient of federal financial aid. Plaintiff has, therefore, failed to state a claim for relief under Title VI against the Union. Accordingly, the Union's motion for summary judgment on Dr. Commodari's Title VI claim is granted.

#### iv. Title VII

The requirements of prima facie case of discrimination are the same under Title VII as under § 1981. *See McLee*, 109 F.3d at 134. Because Dr. Commodari has not produced facts upon which a reasonable jury could find that he has established a prima facie case of discrimination by the Union, *see supra* § 3(b)(ii), his Title VII discrimination claim against the Union fails as well. The Union's motion for summary judgment on Dr. Commodari's Title VII discrimination claim is, therefore, granted.[19]

---

18. Nor has Dr. Commodari alleged any facts showing federal action that would support a *Bivens* action against the Union. *See generally supra* note 10.

19. Dr. Commodari's allegations of Title VII retaliation in his Amended Complaint appear to be directed solely against LIU. (Am. Compl. ¶ 5.7.) To the extent that Dr. Commo-

dari intended these allegations to apply to the Union as well, his failure to charge retaliation in his EEOC charge against the Union, (Rubinstein Aff. of 11/29/99, Ex. 1, EEOC Charge No. 160992923 (failing to check retaliation box and alleging only that Dr. Commodari was "treated differently than other peers in employment practices")), bars this court from entertaining his claim. *See Shah v. New*

## Conclusion

In sum, LIU did not violate the terms of the CBA or the arbitrator's decision by terminating Dr. Commodari on August 17, 1998, and the Union did not breach its duty of fair representation by failing to pursue Dr. Commodari's grievance against LIU arising therefrom. Accordingly, both defendants' motions for summary judgment on Dr. Commodari's § 301/duty of fair representation claim are granted.

Dr. Commodari has stated claims for discriminatory discharge and retaliation against LIU under § 1981 and Title VII that are not timed-barred. However, his discrimination claims against LIU under § 1983 and Title VI must be dismissed due to the absence of state action and his failure to allege that he was the intended beneficiary of federal funding received by LIU, respectively. Accordingly, LIU's motion to dismiss Dr. Commodari's discrimination claims is granted with respect to his § 1983 and Title VI claims, but denied with respect to his § 1981 and Title VII claims.

Dr. Commodari has failed to raise a triable issue of fact with respect to his discrimination claims against the Union. The Union's motion for summary judgment on Dr. Commodari's § 1983, § 1981, Title VI, and Title VII claims is, therefore, granted. Dated: Brooklyn, New York

SO ORDERED.

York State Dep't of Civ. Serv., 168 F.3d 610, 614 (2d Cir.1999) (Title VII action is limited to claims asserted in, or "reasonably related" to the allegations of, plaintiff's EEOC charge). In any case, Dr. Commodari has not alleged any Title VII-protected activity known to the Union, and, therefore, has not established a prima facie case of retaliation. See Taitt, 849 F.2d at 777. Thus, in contrast to this court's treatment of Dr. Commodari's retaliation claim against LIU, the court will not construe any latent retaliation claim Dr. Commodari may have intended against the Union to lie under § 1981.